KENNEDY'S HEIRS AND EXECUTORS v. KENNEDY'S HEIRS.

1. It is not permissible to add to, or vary a contract in writing, by parol evidence; unless the party offering such evidence will lay a ground for its introduction, by the proof of fraud.
2. Neither the common law, nor the statute of frauds and perjuries, inhibit the admission of parol evidence to vary, or totally defeat a written contract tainted with *fraud*.
3. *Semble*. The statute of frauds was intended to prevent fraud, and not as a cover under which it may be consummated; and where such a result would follow the non-execution of a contract, equity will enforce, or set it aside, though its terms are not attested by writing.
4. At common law, fraud does not constitute a bar to an action upon a specialty. The fraud that avoids a specialty at law, must relate to the *execution of the instrument*. But the jurisdiction of Chancery is much more extensive.

5. Courts of equity administer remedies for rights in cases in which Courts of law recognize no rights at all, or if recognized, they are left to the conscience of the parties. Trusts are without any cognizance at common law; but they are cognizable in Courts of equity, and a remedy is there given to the parties, beneficially interested, for all injuries arising, either from negligence, or positive misconduct.

6. So Courts of equity will grant relief, in cases of losses and injuries, by mistake, accident and fraud, as well as undue advantage and imposition, betrayal of confidence, and unconscionable bargains.

7. Fraud as denounced in equity, includes all acts, omissions, or concealments, which involve a breach of a legal or equitable duty, trust or confidence, justly reposed, which are injurious to another, or by which an undue and unconscientious advantage is taken of another.

8. If a deed is fraudulently obtained without consideration ; or for a consideration so inadequate, as to shock the conscience, or if by fraud, accident, or mistake, a deed is framed contrary to the intention of the parties, the forms of proceeding in Courts of law, will not allow them to administer justice; but equity can give the appropriate remedy.

9. It has been repeatedly declared, that such is the solicitude of Courts of equity to suppress fraud, that they will not undertake to enumerate the cases, of which, upon a suggestion of fraud, they will take jurisdiction.

10. A Court of equity will take from a party, the benefit which he may have derived from his own fraud, imposition, or undue influence, in procuring the suppression of an act, intended to be done for the benefit of a third person.

11. Parol evidence is admissible to show the fraudulent use of a deed ; or that a party receiving an absolute deed upon a promise, that he would dispose of the property conveyed by it in a particular manner, refused to perform his promise.

12. Notwithstanding, it may not be allowable at law, to show a consideration other and *different* from that expressed in the deed ; yet, the statement of a specific consideration is inconclusive in equity, and will not prevent that Court, where fraud is proved, from setting aside the deed, or in the case of an absolute deed from administering equitable relief.

13. Where an absolute deed, expressing upon its face, a monied consideration, was shown by extrinsic proof, to have been made upon a promise, by the grantee to the grantor, that he would hold, or dispose of the property conveyed for the use of the heirs of the grantor; which promise he refused to perform. Held that the measure of the relief to which the heirs were entitled in equity, was the cancellation of the deed, and this result could not be avoided by the grantee's offering to pay the consideration expressed in it.

14. In a bill seeking to set aside a deed for fraud, it is not necessary to charge the fraud *in totidem verbis.* If the bill states with directness and precision, fact and circumstances, which amount to a fraud, it is sufficient.

15. So, while it is proper, that every material fact, to which the plaintiff intends to offer proof, should be distinctly stated in the bill ; yet, a general charge, or statement is sufficient, leaving the circumstances to be made out by proof.

16. Although Courts of equity look with jealousy and suspicion upon a purchase made by a trustee of his *cestui que trust,* or by an agent of his principal ; yet such purchases are allowable, if the purchaser made a full and fair disclosure, and took no improper advantage.

Kennedy's heirs and executors v. Kennedy's heirs.

17. Where an application is made to equity, to rescind a contract, the undue exercise of an influence, by the defendant over the complainant, resulting from confidence and friendship, exerts great potency in inducing relief.

18. In a litigation respecting the real estate of a deceased person, his heirs who are interested in the estate, should be parties ;. and the powers conferred upon executors by will, may, in some cases, be so extensive as to make them necessary parties in equity.

19. To coerce a settlement of the accounts of an executor, his executor is .the only necessary party, inasmuch as the personal estate is primarily liable to the payment of what may be found due.

20. In order to prevent multiplicity of suits, Courts of equity sometimes entertain bills by complainants between whom there exists no privity of contract, and against defendants between whom there exists no connection whatever, except ,a community of interest. Thus it is, in a bill by creditors, to subject a fund to the payment of debts, and of " bills of peace" generally.

21. *Semble.* The objection of multifariousness is confined to cases, where the case of each defendant is entirely distinct and separate in its subject matter from that of his co-defendants ; for the case against one defendant may be so entire as to be incapable of prosecution in several suits ; and some other defendant may be a necessary party to only a portion of the case. In the latter, multifariousness is not an available objection.

22. The decisions as to what constitutes multifariousness, are so exceedingly various as to make it difficult, if not impracticable to educe any general rules, by which to test the objection—the Court seeming to regard what was convenient and just in the particular case,—always discouraging the objection where in stead of advancing, it would defeat the ends of justice.

23. The rule against multifariousness it seems is intended to prevent unnecessary litigation, and needless and oppressive expenses.

24. The testimony of a witness who speaks positively to a fact, is entitled to more consideration than several witnesses whose statements are merely negative.

25. Where an absolute deed is made upon a promise, that the grantee will dispose of the property conveyed in a particular manner, the inability to show the terms of the grantee's undertaking, may defeat the intentions of the grantor, but cannot prevent the deed from being set aside.

26. Upon setting aside a deed, on a suggestion of fraud, the rights of both parties must be protected. If the grantee has in good faith made expenditures of money upon the property embraced by it, he is entitled to its reimbursement with interest &c.

27. In the construction of statutes, they should be so interpreted, if practicable, that the intention of the Legislature may be carried into effect, and the spirit of the enactment preserved. Under the influence of this rule, the letter is frequently sacrificed to the general purposes and intention of the act.

28. The Legislature which enacted our statute of frauds, must be presumed to have been cognizant of the construction placed upon the English statute ; and in adopting substantially the terms of that enactment, impliedly approved the judicial interpretation, which it and similar acts had received in England and the United States.

29. It is the settled practice of equity, to direct *an issue at law* where a question

arises upon the validity of a will; *and it seems*, that it would be irregular to render a decree against the heir, until the invalidity of the devise had been found by a jury. According to the practice of the English Chancery, it is usual to direct an issue *to try whether A. is heir &c.*, or the existence of a *modus decimandi*, or a real and immemorial composition for tithes.

30. Although a Court of equity, except in the excepted cases, is not bound to direct an issue, *merely because the evidence is contradictory; yet where the proof is so conflicting as to make it difficult to attain a satisfactory conclusion, it is a prudent, if not an indispensable course, to refer the facts to a jury.*

31. The object of an issue is to satisfy the mind of the Chancellor upon matters of fact, but if his conscience is satisfied, without the aid of a verdict, it is competent for him to render a decree, unless it be in the excepted cases.

32. A decree against infants need not prescribe a time within which they may impeach it after attaining their majority—the statute ascertains the time, and it need not be repeated in the decree.

Joseph S. Kennedy, Jesse Carter and Mary L. (late Mary L. Kennedy) his wife, and Martha Kennedy and Delphine Kennedy, infants under the age of twenty-one years, by Joseph S. Kennedy, their brother and next friend, children and sole heirs of Wm. E. Kennedy, deceased, filed their bill in the Chancery Court, holden at Mobile, on the 22nd April, 1839.

The complainants state that Wm. E. Kennedy for many years previous to his death, was a free drinker, gradually becoming more intemperate and subject to intoxication; and when intoxicated, or partially so, and particularly towards the close of his life, would make conveyances of his real estate to any one who would ask him, for a very inadequate, or no consideration at all.

After the death of Wm. E. Kennedy's wife, (which it seems occurred about 1821,) Wm. E. with all his children, except Delphine, went to the house of Joshua Kennedy, and there resided with Joshua and his family. At that time Wm. E. reposed great confidence " in the honesty, integrity and faithfulness" of Joshua " in the transaction of business." Joshua acted as Wm. E's. agent, consulted and advised him as to the management and disposition of his property.

Joshua, Joseph a younger brother, and others the relations and friends of Wm. E. in consequence of his intemperate habits, and the reckless dissipation of his property, consulted together as to what they should do, to prevent it; whereupon, they concluded it was best to urge and advise Wm. E. to con-

vey his property, or the greater part of it to Joshua, for the benefit of the female complainants and Joseph S. his son.

At different times, Joshua, Joseph, and others, the relations and friends of Wm. E. did urge and advise him to convey his property to Joshua, for the purpose of securing the same for his children. After repeated and urgent solicitations, Wm. E. did on the 13th December, 1824, execute an absolute deed of conveyance to Joshua of extensive and valuable real property, in, and contiguous to the city of Mobile.

And the complainants alledge, that the deed so executed "was intended and meant by the said Wm. E., and so understood and received by the said Joshua at the time it was made, as a conveyance from the said Wm. E. to the said Joshua, *in trust*, for the benefit of your orator, Joseph S. and oratrix, pursuant to the advice and entreaties of the said Joshua and others." "That no part of the consideration in the said instrument mentioned, was ever paid, or intended to be paid by the said Joshua to the said Wm. E.; and that the said instrument was made as it was, upon the advice and opinion of the said Joshua, given to the said Wm. E. that it would make, the said Joshua, a trustee of the estate to be conveyed by it for your orator and oratrix; and upon his promise to the said Wm. E. that he would hold the estate to be conveyed," &c. "in trust for them." "That the said Joshua has repeatedly since the making of said instruments, and until recently before his death, admitted and declared the said instrument to be a conveyance in trust for the sole benefit of the heirs of the said William E.

The lands conveyed, are south of latitude $31^\circ$, and were acquired by Wm. E. while the country in which they are situate, lying between the Iberville and Perdido, was subject to the dominion of the King of Spain.

It is further alledged, that Wm. E. had frequently from 1806 to 1824, lent Joshua money and made him conveyances of land in Mobile and elsewhere. The bill sets out the business in which Joshua had been engaged—his reverses a short time previous to 1824; and avers that by no "manner of means" could he have paid the sum of ten thousand two hundred dol-

lars, the sole consideration expressed in the deed of December, 1824.

It is also stated, that Wm. E. died on the 9th May, 1825— that on the 18th June thereafter, Joshua applied for, and obtained letters of guardianship of the persons and estates of the female complainants and their brother Joseph S. And on the last mentioned day, Joshua also qualified as the sole executor of the will of Wm. E. under an order of the Orphans' Court of Mobile. In virtue of both these trusts, Joshua took possession of a considerable property belonging to the estate of his testator and his wards.

Complainants alledge, that Wm. E. left at his death but one hundred and one eighteen-one hundredths dollars in cash.— That after the death of Wm. E., Joshua sold and conveyed a considerable portion of the real estate conveyed to him, by the deed of December 1824, and received the purchase money therefor; that he received large sums for rent; that much remains unsold, the rents from which are considerable.

After the death of Wm. E., Joshua became possessed of all his valuable papers, including evidences of title to real estate &c.

The bill then alledges the death of Joshua Kennedy, in December 1838, having first made his last will and testament by which he appointed William R. Hallett and Robert L. Walker his executors; who immediately thereafter proved the will, and were in due form invested with authority to execute the same. Joshua at the time of his death, left as his only heirs, his wife Susan Kennedy, and his infant children Secluda, Mary, Clarissa, Joshua and Augusta. That the executors have possessed themselves of the rights and credits, &c. of their testator, as well as all property and papers which were in his hands as the executor of Wm. E. Kennedy or the guardian of the complainants.

It is charged that Joshua refused to execute a writing declaring the terms on which he received the deed of December, 1824, from Wm. E; and that his executors have refused to execute such a writing since his death.

The executors, widow and children, are all made parties, and a guardian *ad litem* is appointed for the infant defendants.

The bill prays that the deed from William E. to Joshua

Kennedy, may be set aside, and that the executors of the latter may be restrained from selling any part of the land embraced by the same, until the cause is finally heard; and that an account may be had, &c.; and such sums as are found due to the complainants or their guardians may be paid—That the executors, the widow and heirs of the testator, and all others claiming title to the lands in question, may be decreed to convey to the complainants so much thereof as was undisposed of by the testator in his lifetime, or his executors since his decease. The bill contains a prayer for general relief, and that *subpœna* may issue in usual form.

The defendants answered jointly and severally, admitting that the complainants are the sole heirs of William E. Kennedy; that William and Joshua were related as stated in the bill; and that William died at the time alledged at the house of Joshua, where he had resided for two or three years previously.

It is also admitted, that Joshua became the guardian of William's children; and that William left a will, and Joshua qualified as his administrator with the will annexed—That the names of the widow and children of Joshua are correctly stated; and that the children are under twenty-one years of age—That Joshua made a will, appointing William R. Hallett and Robert L. Walker, his executors, both of whom have qualified as such.

The defendants deny that Joshua possessed himself of a very considerable estate belonging to the complainants—That if an account had been kept by Joshua of monies expended for his wards, they would be largely indebted to his estate—That Joshua provided many things for the family of William, and paid debts for him before he removed with his children to Joshua's house.

It is alledged, that William was not of a speculative turn of mind, which would have induced him to seek the accumulation of property; that he died comparatively poor; and that the personal estate left by him would not have defrayed the expense of educating his children.

It is further stated that Joshua took the same care of Wil-

liam's children and property as he did of his own—that he expended large sums of money in preserving their property and securing titles to their lands.

The defendants deny that the deed of December, 1824, was subject to any trust whatever; but they alledge that the Price grant was obtained by Joshua for Price, and purchased from him, and that Joshua paid the entire consideration of the purchase—That the conveyance from Price was made to William because he had married a Spanish subject, and could hold lands within the territory of Spain, while Joshua could not; and that William retained the title sometime after 1813, that a confirmation of the Spanish grant might be obtained from the United States.

The defendants think that William had some interest in the Price grant, for the use of his name, or some other cause— What that interest was they cannot undertake to say; but insist that the deed of 1824 was intended as a full and fair settlement of all previous transactions, and a relinquishment of all interest.

It is further stated that, in 1824, Joshua contracted a violent cold, which settled on his lungs, and it was believed by himself and many of his friends, that he would not survive, and was advised to visit Cuba in search of health; previous to his departure he settled with his brothers Joseph and William; and upon a settlement with the latter, the deed of December, 1824, was executed and received without any *trust* on the part of Joshua. The defendants insist that the consideration expressed, viz: ten thousand two hundred dollars, was paid in money, or its equivalent—that, that sum was a full consideration for the land at that day—in 1824 lands in Mobile were of little value, and besides, the title to the property in question was imperfect, and its confirmation was considered as exceedingly uncertain. They affirm that the confirmation of the Price and M'Voy claims, are mainly attributable to the efforts of Joshua, who devoted much time and expended much money to effect that object.

The defendants deny, that William was induced to execute the deed of '24, in consequence of the fraudulent representations of Joshua, and plead the statute of frauds and perjuries

in bar of the admission of parol evidence to contradict the deed. They further deny, that Joshua ever admitted, that that deed was made upon any trust, but affirm, that he always insisted that the Price grant was made to William, because he (Joshua) could not hold lands under the Spanish Government.

The answer states matters in avoidance of the complainant's right to recover, and concludes with a demurrer, assigning several causes; so far as these were insisted on at the argument, they are noticed in the opinion of the Court.

A copy of the will of Joshua Kennedy accompanies the answer, as an exhibit, from which, it is seen, that the executors are invested with very extensive powers over the real and personal estate of their testator. They are permitted to lease, exchange, or sell lands, to arbitrate and compound suits to the same, to do all acts towards perfecting titles and adjusting boundaries, to prosecute, abandon, or defend suits or claims to land, &c,

The record contains some sixty or seventy depositions, some of which are drawn out at great length. In addition to which, it embodies a volume of deeds and other documentary proof, which it is not deemed necessary to notice in detail. The following statement of facts are entirely sufficient to the correct understanding of the opinion of the Court.

The lands comprised in the deed of 13 December, 1824, from William E. to Joshua Kennedy, consist of the McVoy and the Price grants. The former was conveyed to William E. and Joshua jointly by McVoy on the 6th May, 1814. The latter consisted originally of two concessions or grants made by the Spanish government to Thomas Price. The first was a concession by Governor Gayosa to him for six hundred arpents in 1798. On the 1st September, 1806, Price, desiring to obtain an additional grant for five hundred arpents, by Joshua Kennedy as his agent, petitioned the Intendant General at Pensacola, who granted the petition "by way of sale," and directed the survey to be made. On the 20th November, 1806, Price, by a petition, addressed to the commandant at Mobile, set forth that he had created Joshua Kennedy his agent at Pensacola, to obtain for him a further grant of five

hundred arpents of land, in consideration of the arrears of his salary for three years as Interpreter, and other claims which he had on the government, and denying his authority to purchase land for him ; and also setting forth, that the boundaries of the land granted on the petition of Kennedy, were included in the grant already made by Gayosa—and prays, in consideration of the premises, a grant of five hundred arpents, the intended boundaries of which are given. This petition was granted by the Commandant at Mobile, and confirmed by the Intendant General at Pensacola, and an order issued to the proper officer at Mobile to make the necessary survey.

This last mentioned tract was, on the 22d November, 1806, conveyed by Price to William E. Kennedy for the consideration, as expressed in the deed, of two hundred dollars ; and on the 24th of the same month, he executed to him an irrevocable power of attorney to cause the necessary survey to be made.

On the 25th August, 1813, for the consideration of five hundred dollars, Price conveyed to William E. Kennedy the tract of land granted to him by Gayoso in 1798. These grants were subsequently confirmed by Congress.

Portions of these lands were at different times conveyed by William to Joshua Kennedy, from 1815 to 1820, the consideration expressed in some of the deeds being money paid, and in others a valuable consideration. One of these deeds, dated the 20th of November, 1818, conveys to Joshua Kennedy eighty arpents, part of the Price tract, the consideration being expressed to be the "sum of five hundred dollars to me formerly paid at the time of purchasing a tract of land from Thomas Price by Joshua Kennedy." William also made nearly one hundred deeds to other persons, for portions of the land between the years 1817, and the execution of the deed from him to Joshua of December, 1824. During the same interval, some conveyances for portions of the land were made by the brothers jointly, and a few by Joshua individually.

In 1818 or 1819, a deed of partition appears to have been made between the two brothers, accompanied by a map executed by one Matthews, on which the lots allotted to each were marked with the initials of their names. This deed has

not been produced, and is probably destroyed; but a copy of the map, supposed to have been made by Matthews, is preserved, and is among the papers of the cause.

A very brief abstract of such portions of the testimony as are deemed at all material, is as follows:

Seafroy Dolive was the brother-in-law of William E. Kennedy, and knew that he purchased the Price and McVoy claims. William resided with Joshua after the death of his wife, and was intemperate. Joshua told witness and his brother Louis, that William was fooling away his property; and the only way to save it for his children, if they were willing, was to induce William to convey his property to him. Witness afterwards advised William to convey his property to Joshua for the benefit of his children; and a few months before his death, he told witness he had done so. Joshua also told witness before the death of his brother, he had made over his property to him for the benefit of his children; and frequently after his death, told witness he had saved his brother's property for his children, and that they would be rich.

Samuel H. Garrow knew both the Kennedys'. William, for several years before his death, resided with Joshua. He was intemperate, and, in the opinion of witness, when intoxicated would easily part with his property. Has an impression that he was present at a conversation between the two brothers, in which William was advised to make over his property to his brother Joshua to prevent his making away with it. Witness heard from Joshua that a deed had been made by William, by which something would be saved for his children. Joshua, for some time before William's death, transacted all his business. William had great confidence in Joshua, and would let him do any thing he pleased. The Price claim was always reported to be the property of William. Was present at the execution of the deed of partition in 1818 or 1819, and knows of no conditions attached to it.

Daniel Robertson says Joshua stated to witness, that he had got the titles in his own name for the better management of the property; and that it was not thereby intended to take away the right of the children of William to it. Had several conversations, after the death of William, to the same purport.

Louis Dolive was the brother-in-law of William E. Kennedy, and says William was occasionally intemperate, and when drunk, very free and generous. Knows that William purchased the Price claim, and understood that William and Joshua purchased the McVoy claim jointly. Says that Joshua came to him and said that William was wasting his property, and that something should be done to save it for his children. Witness replied, that he was the most proper person to do it, as he had influence over him. Some time after, Joshua told him that his brother had passed to him all his property by a deed of trust—that he had the whole management of it, and his children would have plenty of land. Says that Joshua had as much influence over his brother as a father over his child.

Cyrus Sibley states, Joshua told witness it was his intention to divide his Mobile property equally between his children and those of William. In the latter part of his life, William was much debilitated, and seemed to have a dependence on Joshua for advice and counsel.

Chester Root heard Joshua say, that William was giving away lots in the Price claim, and that he had advised William to give him a deed of all the unsold lots in the Price claim, that he might preserve it for his heirs. Believes he heard the late John Elliott, Esq., advise William to put all his property into Joshua's hands. Has heard Joshua say repeatedly, that his great object in taking possession of the property of William, was for the benefit of his heirs; and as late as the year 1828, heard Joshua say he had got his brother's estate so fixed that his heirs would be very wealthy.

Joseph Krebs says, Joshua told witness that William had given him a deed for his lands, because he was fooling them away; but did not state the object of the conveyance.

Patrick Byrne says, the health of William was considerably impaired in the latter part of his life; and thinks that he looked to Joshua for counsel and advice, and gave him the control of his property.

John Shelton wished to purchase of Joshua a lot near the centre of the Price claim, which he declined to sell, saying it belonged to the heirs of William. This was in 1827 or 1828.

Edward Hall thinks that William's habits had been affected by intemperance; and that in the latter part of his life, he had given up the management and control of his property to Joshua, who appeared to have unlimited control of his effects.

B. Smoot says, Joshua had great influence over William; and that he was guided by his opinion and advice in relation to his affairs

G. Davenport says, Joshua appeared to manage his brother's landed estate, and he appeared to lean on him for counsel and advice. Heard Joshua say, after the death of his brother William, in reference to the sale of some lands, that it was for the benefit of his brother's children; that the property of the heirs of William was large; and that they would be very rich.

Thaddeus Sanford was the editor and proprietor of the Mobile Commercial Register in 1829; in the month of Februry and March of that year, an advertisement appeared in that paper, advertising a sale of lands in the city of Mobile.

[Signed.]          JOSHUA KENNEDY,
                      HENRY GARRISON,
                           *Auctioneers.*

The witness has not been able to find the manuscript, but the expense of the advertisement was paid by Joshua Kennedy. A portion thereof is to the following effect:

The squares between St Louis and St. Michael streets, will be leased for ten years, at the expiration of which period, the property shall revert to the legal heirs and representatives of William E. Kennedy, deceased, and the undersigned in equal proportions."

Diego McVoy says, towards the close of the life of William E. Kennedy, he did not consider him capable of managing his own affairs, and that he depended on Joshua to manage his business

Maxfield Kennedy, the brother of Joshua and William, states, that the latter was indicted and tried in South Carolina, for the murder of Col. Maxwell, in 1797; that the expenses of the trial were near ten thousand dollars, and advanced by him; that he came to Mobile frequently for payment; that in 1820, Joshua assumed the payment, but has never paid him but six-

teen hundred dollars, and that he holds his estate bound for the residue.

Waddy Thompson, Senr., of South Carolina, states, that he was a parctising lawyer at the time William Kennedy was tried for the murder of Col. Maxwell, that he was acquitted, and that the expenses of the defence could not have been more than five hundred dollars. That he knew Maxfield Kennedy, and that he could not have paid the one hundredth part of ten thousand dollars, either in money or by his credit.

John G. Aikin knew Maxfield Kennedy in Tuscaloosa county—he was very poor.

Witness had a conversation with Joshua Kennedy in 1835, in which Joshua spoke of his advances to Maxfield, as a gratuity—asked for, and given as such.

Samuel Kitchens states, that Joshua went to Havanna with some lumber to sell, and on account of his health, which was very bad in the winter of 1825; while he was gone, a report prevailed, that he had died on the outward passage.

Witness was in Mobile at the time, and had a conversation with William Kennedy, who told witness that a settlement had been made between him and his brother previous to his departure for Havanna, and expressed his gratification, that it had been done, should the report of Joshua's death be true; as there could now be no difficulty between him and the heirs of Joshua.

Thomas H. Lane says, he saw William in the latter part of the year 1824, who told him he had come across the Bay to have a settlement with his brother, and had succeeded in doing so; and that any lands he might wish to purchase, he could purchase from Joshua, whose title would be good.

George N. Stewart had a conversation with Joshua Kennedy in his last illness, who, speaking of the claim of his brother's heirs, said, that the property was his, and always had been his; that he had got it for Price, and bought it from Price, and that it never belonged to William, and that the title was taken in his name, because he was a Spanish subject and could hold lands, and that he, Joshua could not.

Charles de Laye says, that William told him that he owned the lands, but that Joshua had the control of them, and he never did any thing without his, Joshua's consent. In the latter part of 1824, or commencement of 1825, he applied to William to sell him a piece of land, when William told him he had sold every thing to his brother Joshua, and had nothing to do with any claim he had before. Offered to go to Joshua and ask him to sell the land to witness; they went, but did not find him.

William Kitchens says, that the health of Joshua Kennedy was bad at the time he went to Havanna; that he carried eighty thousand feet of lumber with him; that none of his connections went with him, and he had no clerk, or business agent with him; William Kennedy and his family lived with Joshua after the death of William's wife.

Many witnesses on both sides speak of the health of Joshua at the time he left for Havanna, which was, shortly after, the execution of the deed of 1824.—Some considering his health very bad, others, that he was in usual health, and that the object of his visit was the examination of Spanish records. It was also proved, that before he left, he made a settlement with his brother Joseph.

A great many witnesses were also, examined, who proved that they were intimate with Joshua Kennedy, and never heard that the children of William had any claim or right to the estate, or that Joshua held the property in trust for them.

Joshua supported and educated the children of William, and at his death gave to each of them a square of land in the city of Mobile, on condition they relinquished all further claim on his estate, which condition he exacted, as he stated to Mr. Stewart, because he had heard that some of the children intended to prosecute a claim against his estate, after his death, and he did not wish his children harrassed by law suits.

The cause came on to be heard at a term of the Chancery Court, holden in November, 1840, on the bill, answer, exhibits and proof: whereupon it was adjudged, that the deed of the 13th December, 1824, was not upon any consideration deemed valuable in law; but for the purpose of enabling Joshua Kennedy to secure and provide for the management of the estate,

in which he was interested, and to secure an adequate provision for the children of William E. Kennedy. It was also adjudged that Joshua and William E. Kennedy were jointly interested in the Price and McVoy claims, and that the Baudine claim, was covered by the Price claim.

It was further determined, that the complainants, as heirs of William E. Kennedy were entitled to an account of the monies received by Joshua Kennedy in his lifetime, and by his executors since his decease, upon all sales of land embraced, either in the Price, McVoy or Baudine claims; and also, to an account from the executors of the monies received by Joshua Kennedy in his lifetime, as guardian of the complainants, and as administrator of the estate of William E. Kennedy.

It was also ordered and adjudged, that the complainants be admitted into the possession of an undivided half of the Price, McVoy and Baudine claims; save and except such parts thereof, as were sold and conveyed, either by the said William E. or Joshua Kennedy, or the executors of the latter, since his decease; and that it be referred to the Master to prepare a deed conveying to the complainants those lands, with the exception aforesaid, which deed shall be executed by the executors of Joshua Kennedy, under the power contained in the will of their testator, and in obedience to the directions of the decree.

It was also referred to the Master to state the accounts between the complainants, and the defendants, Hallett and Walker executors, &c., as representing Joshua Kennedy in his several capacities of guardian of the children of William E. Kennedy, and executor of his last will and testament, and also trustee, under the deed of the 13th of December, 1824; and also, to state an account between the complainants and defendants, Hallett and Walker, executors, on account of lands sold, or conveyed by them, since the death of their testator. And it was further ordered, that in taking the several accounts required, the executors of Joshua Kennedy be allowed all fair credits, to which, individually, or in their representative capacity, they may show themselves entitled. It was lastly ordered and adjudged, that Hallett and Walker, executors as aforesaid, pay

the costs of this cause from the estate of their testator, in their hands, to be administered.

To revise this decree, the defendants have prosecuted a writ of error to this Court.

This cause was elaborately and ably argued, as well for the plaintiffs in error, as the defendants; the argument occupying the attention of the Court for ten consecutive days. It is impossible to do justice to the learned counsel by any report of their arguments, that can be here made, but the points raised so far as it was thought necessary to consider them, will appear from the opinion of the Court.

J. GAYLE, THORNTON & STEWART, for the plaintiffs, insisted upon the following general proposition, viz:

*First.* The bill is multifarious, in seeking to set aside the deed of 1824, from William to Joshua Kennedy, and to obtain a settlement of the accounts of the latter, as the executor of the will of William.

*Second.* The deed from William to Joshua expressing a monied consideration, and being absolute on its face, parol proof, to show that it was made upon a trust, or condition, is inadmissible. [11 Vermont Rep. 138; 6 Johns. Rep 20, 7; Ibid. 186, 16; Ibid. 302; 6 Wend. Rep. 277; 1 Lom. Dig. 198, 9, 200, 315; 1 Phil. Ev. 265, 548, to 552, 560, 7, 8, 9, 570, 2, 5, 6, 7, 8, 598, 9, 2; Story's Eq. 243, 4, 286, 742, 6; 3 Phil. Ev. H. & C. notes 967, 1432. 4, 1449, 1451; 1 Johns. Ch. Rep. 147; Ibid. 339, 594; 5 Ibid. 1; 6 Ves. Rep. 32; 1 Dess. Rep. 333; 1 Gill. & J. Rep. 80; 10 Ves. Rep. 517, 12; Ibid. 74; Caro. L. Rep. 262; 4 Kents' Com. 142; 1 Bibb's Rep. 610, 203; 2 Bibb's Rep. 311; 4 Ibid. 59, 103, 472, 4; 5 Porter 195, 498; 1 Story's Eq. 158, 165: 3 Litt. Rep. 402; 5 Litt. Rep. 74; Litt. Sel. Ca. 412; 3 Ves. Rep. 706; 1 Bro. Ch. Rep.; 4 Russell's Rep. 738; 21 Wend. Rep.; 6 Wheat. Rep. 418; 1 Peter's Rep. 364; 3 Stewt. & Porter's Rep. 230; Roberts on frauds 80, 7, 102, 3.

*Third :* Even admitting it was competent to establish a trust or condition by parol, the proof is the record in insufficient for that purpose.

HALL, CAMPBELL & HOPKINS, for the defendants, cited, 2 Atk. 150, 254; 1 Por. Rep. 338; 4 Johns. Ch. Rep. 167; 2 Vern. Rep. 307; 2 Munf. Rep. 187; 5 Rand. Rep. 211; 1 Atk. 47; 2 Atk. 98; 16 Mass. Rep. 220; Roberts on Frauds 102; 5 Viner's Ab. 521; 1 Ves. Sen. 123; 1 Vern. Rep. 296; 2 Ibid. 505; 2 Ves. Beames 260; 3 Atk. 539; 10 Cond. Eng. Ch. Rep. 241; 1 M. C. Ch. Rep. 119: Amblers' Rep. 67; 2 Chan. cases 179; 1 Dall. Rep. 424; 1 Paige's Rep. 147, 280; 6 Paige's Rep. 355; 14 Ves. 273; 10 Cond. Eng. Ch. Rep. 188; 2 Ves. Sen. 548, 627; 2 Sch. & Lef. Rep. 500; 10 Peters' Rep. 269; 13 Ves. 136; 9 Ibid. 292; 7 Bro. Par. cases 70; 1 Vern. 205; 3 Cow. Rep. 537; 1 Por. Rep. 338; 1 Johns. Ch. Rep. 582; 1 Dall. Rep. 193; Roberts on wills 59; Story's Eq. Plead. 229; note 1, 230, 2, 408 to 414; 4 Phil. Ev. H. & C. ed. 1489, 1491; Roper on Leg.; 1 Chap.; Roberts on Frauds 333; 1 Wash. C. C. Rep. 397; 2 Sumner's Rep. 613; 3 Mod. Rep. 191; 2 Ves. Rep. 287; 5 Ves. Rep. 644; Roberts on Frauds 92, 3; 3 Peters' Rep. 210; 6 H. & Johns. Rep. 435; 9 Ves. Rep. 515; 6 Ves. Rep. 51; 3 Leigh's Rep. 492; 7 Cond. Eng. Ch. Rep. 509; 3 Wend. Rep. 380; 2 Sumner's Rep. 498; 10 Pet. Rep. 509; 2 Har. & Gill. Rep. 200; 9 Por. Rep. 63; 8 Cow. Rep. 290; 2 Hall. S. C. Rep. 433; 13 Johns. Rep. 400; 2 Johns. Rep. 177; Story's Eq. Pl. 144, 190; 1 Mitf. Pl. 175; 3 Paige's Rep. 379.

COLLIER, C. J.—In the examination of this cause, we are to inquire, *First*: does the law arising upon the bill, answer, and the demurrer embraced by the latter, entitle the complainants to the relief they seek. *Second*: has the case of the complainants been made out by proof?

*First:* Where parties have entered into a contract in writing, in the absence of fraud, the law intends, that the writing contains the entire agreement, and consequently, will exclude all parol evidence tending to show, that there were other terms not embraced. [Paysant v. Ware, Barringer, et al., 1 Ala. Rep. N. S. 160.] If, therefore, a party would show, that the contract contains other terms than the writing indicates, it is incumbent on him to lay a foundation for the introduction of such proof. [Prevost v. Gratz, 6 Wheaton's Rep. 481.] But

neither the common law, which accords to writings a higher dignity in the scale of evidence, than mere oral statements, nor the statute of frauds and perjuries, inhibit the admission of parol evidence to vary, or totally defeat, a written contract tainted with fraud. [2 Story's Eq. 55.]

In Sweet v. Jacocks, 6 Paige's Rep. 355, it appears, that Jacocks, acting in behalf of his eight illegitimate children, effected a compromise with their brother and sister of the half blood, by which the latter released to him eight-tenths of certain property, which they inherited through their mother, for the use of the illegitimate children; but the conveyance on it face, was absolute. Both the vice-Chancellor and Chancellor were of opinion, that the beneficial interest in the property released to Jacocks, belonged to the eight children, and that he could not set up their illegitimacy as a defence to their claim. And that, having assumed to act for them, and actually obtained the property under a conveyance, intended for their benefit, he could not be permitted to insist, that they had no interest in that property, and that he held it discharged of the trust. The Chancellor lays it down as "a settled principle, that where a person undertakes to act as agent for another, he cannot be permitted to deal in the matter of that agency upon his own account, and for his own benefit. And, if he takes a conveyance in his own name, of an estate, which he undertakes to obtain for another, he will, in equity, be considered as holding it, in trust for his principal." [Parkist v. Alexander, 1 Johns. Ch. Rep. 394; Lees v. Nuttall, 8 Cond. Eng. Ch. Rep. 245.] And though the Court in Boyce's Ex'r. v. Grundy, 3 Peters' Rep. 219, admitted that, reducing a contract to writing, was, in most cases, an argument against fraud, that it was very inconclusive; and the doctrine, that a written agreement could not be relieved against, on the ground of false suggestions could not be maintained. Evidence leading to such a conclusion, will not vary the written contract; the allegations of false suggestions and immoral concealment, suppose that the party seeking relief, was entrapped in an agreement, in which he would not otherwise have entered. "This is not denying," say the Court, "that the agreement in the record was the

agreement entered into, but insisting, that it was vitiated by fraud, which vitiates every thing.

In Hutchins v. Lee, 1 Atk. Rep. 447, a bill was filed " to set aside an assignment of a leasehold estate, and all other the estate and effects of the plaintiff, upon a suggestion, that the same was never intended as an absolute assignment for the benefit of the defendant, but made only to ease the plaintiff of the trouble and care of managing his own concerns at that time, (being then under great infirmities of body and mind,) and subject to a trust for the benefit of the plaintiff, if he should afterwards be in a capacity of taking care of his own affairs." The assignment was absolute in its terms. The Lord Chancellor held, that, although there cannot be a verbal declaration of a trust, since the statute of 29 Chas. 2 ; yet, the parol evidence is proper in avoidance of a fraud, which the defendant intended to practice on the plaintiff, by attempting to deprive him of the benefit of his estate. [See also, Watkins v. Stockett, 6 Har. & J. Rep. 435 ; Story's Eq. 197, 8, 9, 200.]

It has been said, that the statute being intended to prevent fraud, its original design would be prevented, if it could be used as a cover under which fraud could be successfully consummated ; consequently, it has been often held, that where such a result would follow the non-execution of a contract, equity would enforce, or set it aside, though its terms were not attested by writing.

In Podmore v. Gunning, 7 Cond. Eng. Ch. Rep. 509, the Vice Chancellor remarked, " I have always understood that the Court would interfere to prevent the obtaining an estate by fraud, notwithstanding the statute of frauds. A variety of cases might be put. Suppose a man deputes an attorney to buy an estate for him, and the attorney purchases that estate for himself; the Court would interpose, notwithstanding, the statute of frauds."

And in Strickland v. Aldridge, 9 Ves. Rep. 518, Lord Eldon said the statute was never permitted to be a cover for fraud upon the private rights of individuals ; and though, within the intention, it cannot be said a trust is declared under these circumstances, it is clear a trust would be created upon the principle, on which this Court acts as to fraud. [See Mucklestone

v. Brown, 6 Ves. Rep. 69 ; Roberts on frauds, 79, 102 ; 3 Walker v. Walker, 2 Atk. Rep. 98 ; Barrow v. Greenough, 3 Ves. Rep. 152 ; Reigal v. Wood & others, 1 Johns. Ch. Rep. 406 ; Whelan v. Whelan, 3 Cowan's Rep. 537 ; Boyd v. McLean, 1 Johns. Ch. Rep. 582 ; Clinian v. Cook, 1 Sch. & Lef. Rep. 2 ; 2 Dess. Rep. 14 ; 2 Story's Eq. 78, 9, 746.]

In Brown v. Lynch & Lynch, 1 Paige's Rep. 147, it appears, that the paintiffs were owners of a farm, which, by a fraud upon them, was mortgaged by their brother. The mortgage was foreclosed in Chancery, and the farm advertised for sale by a Master. Before the sale, the defendant agreed with the plaintiffs, to purchase in the farm for their benefit, for which he was to receive a stipulated compensation. The mortgagee in order to favor the plaintiffs, agreed with the defendant that he might bid off the property at fifteen hundred dollars. The defendant at the sale prevented others from bidding, by representing, that he intended to buy for the plaintiffs. The defendant purchased the farm at the Master's sale for fifteen hundred and forty dollars—about one thousand dollars below its value. Afterwards the defendant refused to convey the farm to the plaintiffs, or to account to them for its value, although they tendered to him the amount of his bid, with interest, and the sum agreed to be paid for his services. The Vice Chancellor having decided in favor of relief, the defendant appealed to the Court of Chancery. The Chancellor considered it was a gross fraud under the circumstances, for the appellant to hold out to the appellees, " that he was bidding off the property for their benefit, when he in fact, intended to appropriate it to his own use. If the appellant did, in fact, bid it off for them under the agreement, he held it in trust for them, and had no other interest in it, than that of a mortgagee, to secure the repayment of the purchase money, and the sixty dollars, agreed to be paid him for his trouble. But, if he had no such intention, and did not, in fact, bid off the property in trust for them, he was guilty of a fraud, which this Court will relieve against." [See Boyd v. McLean, 1 Johns. Chan. Rep. 582 ; Pickett v. Loggon, 14 Ves. Rep. 234 ; Barnesley v. Powell, 1 Ves. Rep. 289.] And in Mestaer v. Gillespie, 11 Ves. Rep.

626, Lord Eldon said, that, notwithstanding the statute of frauds emphatically declares, that a writing is essential to the validity of certain contracts; yet, it was never intended, that a fraudulent use should be made of the statute; and the cases, are perfectly familiar, in which Chancery has interfered against a party seeking thus to shelter himself, by declaring, that he shall not take advantage of his own fraud. [See Keatts v. Rector, 1 Arkansas Rep. 422, 3, 5, and cases there cited.]

Independent of any statutory provision, fraud does not constitute a bar to an action upon a specialty. The fraud that avoids a specialty at law, must relate to the execution of the instrument. [See Phil. Ev. C. & H. ed., 1449, and cases cited; Jackson v. Hills, 8 Cow. Rep. 290; Swift v. Fitzhugh, 9 Por. Rep. 39; Mordecai & Wanroy v. Tankersly, 1 Ala. Rep. N. S. 100.] A defendant may give evidence tending to show, that the deed was mis-read, read but in part, or mis-expounded to him, or that one instrument was substituted for another, and thus his signature was fraudulently obtained,—this is what is meant by "fraud in the execution." [3 Phil. Ev. C. & H. ed. 1449, and cases cited.] But the jurisdiction of Chancery is much more extensive. Courts of equity administer remedies for rights, in cases, in which Courts of law recognize no rights at all; or if recognized, they are left to the conscience of the parties. Trusts, technically so called, are without any cognizance at common law, and their abuse of consequence, beyond the reach of legal process. But they are cognizable in Courts of equity, and an ample remedy is there given in favor of the parties beneficially interested, for all wrongs and injuries, whether arising from negligence or positive misconduct. There are cases of losses and injuries by mistake, accident and frauds, as well as undue advantages and impositions, betrayals of confidence and unconscionable bargains; in all which, Courts of equity will interfere and grant redress; but of which the common law takes no notice, or silently disregards. [1 Story's Eq. 27, 8, 9: 194 et post.; 1 Bla. Com. 92; Mitf. Pl. 111, et post.] "It may be correctly said, that the maxim, that equity follows the law, is a maxim liable to many exceptions; and that it cannot be generally affirmed, that where there is no remedy at law in the given case, there is none in equity; or, on the other

hand, that equity in the administration of its own principles, is utterly regardless of the rules of law. (1 Story's Eq. 75; Kemp v. Pryor, 7 Ves. Rep. 249, *et post.*)

Fraud is defined by the civilians to be any artifice or deception used to cheat, or deceive. This definition would however seem to embrace only actual or positive frauds. But fraud, as understood and denounced in equity, includes all acts, omissions, or concealments which involve a breach of a legal or equitable duty, trust or confidence justly reposed, which are injurious to another, or by which an undue and unconscientious advantage is taken of another. And Courts of equity will not only interfere in cases of fraud, to set aside acts done; but will also if by fraud, acts have been prevented from being done by the parties, interfere and treat the case precisely as if the acts had been done. (1 Story's Eq. 197; Chesterfield v. Jansen, 2 Ves. Rep. 155, *et post.*

The statute of frauds is binding in all Courts, and the refusal of a Court of equity to give effect to it, according to its letter, is not influenced by any claim of right, to disregard the expressed will of the legislature, but rather from a desire to uphold the spirit of the enactment. Mr. Justice Story addressing himself to this subject says, " It is obvious that Courts of equity are bound as much as Courts of law, by the provisions of this statute ; and therefore, they are not at liberty to disregard them. That they do however interfere in cases within the reach of the statute, is equally certain. But they do so not upon any notion of a right to dispense with it; but for the purpose of administering equities subservient to its object, or collateral to it and independent of it." (2 Story's Eq. 57.)

If a deed is fraudulently obtained, without consideration; or for a consideration so inadequate as to shock the conscience; or if by fraud, accident, or mistake a deed, is framed contrary to the intention of the parties, the forms of proceeding in the courts of common law, will not tolerate such an investigation there, as will enable those Courts to do complete justice. On this ground Courts of equity will restrain proceedings at law, until a full inquiry has been made. And if it appears that the deed has been improperly obtained; or that it is contrary to the inten-

tion of the parties in their contract; they will in the first case compel a delivery and cancellation of the deed, and make such further order, as may be necessary to dissolve the contract, and place the parties *in statu quo.* In the second case, they will either rectify the deed according to the intention of the parties; or will restrain the use of it, in the points in which it has been framed contrary to, or has gone beyond their intention in the original contract. (1 Story's Eq. 418-9.

It has been said, that such is the abhorence with which fraud is viewed at common law, and such the solicitude of Courts of equity to suppress it, that they have repeatedly declared they will not undertake to enumerate the cases, of which, upon a suggestion of fraud, they will take jurisdiction. (1 Story's Eq 196 and note.

Lord Hardwicke in his celebrated judgment in Chesterfield v. Jansen, 2 Ves. Sr. Rep. 155, says equity has an undoubted jurisdiction to relieve against every species of fraud; and that fraud may be presumed from the circumstances and situation of the contracting parties; and may be apparent from the intrinsic nature and subject of the bargain. (Woodhouse v. Brayfield, 2 Vern. Rep. 307.

Among the acknowledged grounds of equity jurisdiction, is the fraudulent prevention of acts to be done for the benefit of third persons; Courts of equity will take from a party, the benefit which he may have derived from his own fraud, imposition, or undue influence in procuring the suppression of such acts. Wherever the relief sought arises from the fraud and imposition of the defendant, it "has nothing in the world to do with the statute of frauds and perjuries." (Walker v. Walker, 2 Atk. Rep. 99; Devinish v. Baines, Prec. in Chan; Chamberlain v. Chamberlain, 2 Freem. Rep. 34; Driver v. Fortner, 5 Porter's Rep. 9.)

In Young v. Peachy, 2 Atk. Rep. 254, it appears there was settled on Zaccheus Bredon by the will of his father certain houses in London, remainders to his sons in tail, remainder to his daughters and the heirs of their bodies. Zaccheus had no sons, but had two daughters, Margaret and Lydia. Margaret intermarried with Joseph Fox, who became very extravagant

and in very bad circumstances. Zaccheus desiring to prevent the property, in the event of his death, going into the possession of Fox; represented to his daughter, that it would be for her benefit to join in a common recovery of a moiety of the premises, and desired her to persuade her husband to join in the same, and by a deed to be made thereupon, declaring such recovery to be to the use of Zaccheus and his heirs; this moiety would be protected from the creditors of Joseph Fox; and at the same time, promised Margarett, that he would take the estate, so to be created by the recovery and deed, and declare the uses thereof, as a trustee only, for her and her heirs, and that the operation of law would be such thereupon, he not paying any consideration for the same, and that he would not claim or insist upon any advantage therefrom. A recovery was accordingly suffered and declared by a deed (Margaret and her husband being parties) to be to the use of Zaccheus and his heirs, but no consideration was paid by him, or any one on his behalf to his daughter and her husband.

Zaccheus from the time the recovery was suffered, constantly paid to Margaret an annuity of thirty pounds *per annum*. Afterwards Zaccheus became a bankrupt, and Sir Robert Peachy and others were chosen his assignees. Zaccheus died, and not long thereafter Margaret and her husband died without issue, intestate.

Lydia and her husband filed a bill against the assignees, and a mortgagee under a mortgage from Zaccheus, after the recovery suffered, praying amongst other things, that the recovery might be set aside as unduly obtained, and that in consequence of this, the plaintiff might be allowed to redeem the mortgage, as entitled in remainder under the will of Zaccheus' father.— The plaintiffs consenting that the thirty pounds *per annum* paid Margaret, should be refunded; the Lord Chancellor was of opinion that the recovery ought to be set aside as unduly obtained; and in consequence of this, the plaintiffs were entitled to redeem the mortgage.

Relief was granted, not upon the ground of the absence of a consideration, moving from Zaccheus to Margaret and her husband: for "his Lordship said, the plaintiffs could not be re-

lieved on the motion of a trust; however, he thought they had a proper ground to be relieved upon, under the head of fraud."

"It manifestly appears," continued his Lordship, that "the conveyance from Fox and his wife, was obtained in order to answer one particular purpose; but that the father has attempted to make use of it for a very different purpose; and there having been a great many cases, even since the statute of frauds, where a person has obtained an absolute conveyance from another, in order to answer one particular purpose, but has afterwards made use of it for another, that this court has relieved under the head of fraud; for a practice of this sort is a deceit and fraud, which this court ought to relieve against; the doing it, is *dolus malus,* and that appears to be the present case."

Upon the same principle, if a legatee promises a testator, if he will make a disposition in his favour, he will transfer the subject of the bequest, or demise, to a third person, the person making the promise will be obliged in equity to a performance. [Drakeford vs. Wilks and others, 3 Atk. Reports, 539; Chamberlain vs. Agar, 2 Vesey & Beames' Rep. 259; Podmore vs. Gunning, 7 Sim. Rep. 644; Reach vs. Kennegal, 1 Ves. Sr. Rep. 124; Ambler's Rep. 67; Thynne vs. Thynne, 1 Vern. Rep. 296; Oldham vs. Litchfield, 2 Vern. Rep. 504; Barrow vs. Greenough, 3 Ves. Rep. 152; Goss vs. Traceby, 1 P. Wms. Rep. 288; Luttrell vs. Lord Waltham, cited in the case of Huguenin vs. Basely, 14 Ves. Rep. 290.]

In the Lessee of Thomson et ux vs. White, 1 Dall. Rep. 424, the facts were substantially as follows: Dorothy Gordon, being seised in fee of a moiety of the premises in question, intermarried with Lawrence Saltar; and having lived long with him without any prospect of children, she was desirous of making a provision for an only sister of the whole blood, one of the lessors of the plaintiff, whose husband, the other lessor, was much reduced in his circumstances. Mrs. Saltar being upon a visit to her husband's brother, John Saltar, at some distance from their residence, was taken sick; and after a conversation relative to her estate, it was agreed by her husband and herself, that it should be settled on them for their lives,

and for the life of the survivor of them and afterwards it should go to her sister the lessor, and her heirs lawfully begotten; and in default of such heirs to the children of her three sisters of the half blood. A deed was accordingly drawn to that effect; but upon its being read to her, she thought the expression "heirs of her body," indelicate, as applied to an unmarried sister of the half blood, and for that reason refused to sign it, notwithstanding the persuasions of her friends. Whereupon her husband proposed to her, that a deed should be drawn from them to his brother John, who, with his wife, should convey the premises to him and herself as joint tenants in fee; and he promised as soon as he got home he would make his will, or in some other way settle the estate in the manner projected,— Mrs. Saltar hesitated at this proposition, but on her sister telling her that "she might rely upon him—for if there was a man in the world, who could be trusted in such a case, it was him;"—and on her husband requesting her to comply, declaring that "if there was faith or truth in man, he would honestly perform what he again promised." She executed the deed to John Saltar, who, with his wife, reconveyed the estate according to the previous stipulations. Mrs. Saltar died about six months after the deeds were executed; and her husband died intestate and without issue, about eighteen months after her decease. Lawrence Saltar, during his life, managed the estate as if it had belonged to the lessors of the plaintiff. In his last sickness, indeed, when near expiring, he told his brother that he was very uneasy on account of his leaving no will; and soon after this declaration he lost his reason. The question was whether this evidence was admissible.

The court remarked, that since the statute of frauds, it had been a general rule that no estate, or interest in lands, shall pass, but by deed or some writing signed by the parties; and that parol evidence is inadmissible to contradict, add to, diminish or vary a deed or writing. But it was admitted that to this rule there were exceptions. For instance, where a declaration is made before a deed is executed, shewing the design with which it was executed; the decisions in the court of chancery have been grounded upon parol proof of a single witness against a deed of settlement. And in cases of fraud and trust, it was

said that parol evidence had been admitted to show that a deed absolute in its terms was intended to be in trust. [Hampton vs. Spencer, 2 Vern. Rep. 288.]

The court said further, that the statute of frauds should be beneficially expounded for the suppression of frauds; and where there had been a fraud in obtaining a conveyance from another, the grantee might be considered as a mere trustee.— [Loyd vs. Spillet Barnard, in Can. 388.] The parol evidence was held to be admissible, on the ground that the breach of trust in Lawrence Saltar was a *fraud in law*, which was not within the act; and a judgment was entered for the plaintiff. Here it may be observed, that there was no proof from which an actual fraud could be imputed to Lawrence Saltar; for he always managed the property as if it belonged to the lessors of the plaintiff; and even *in extremis* expressed uneasiness that he was about to die without having made a will. Yet the court considered the failure to perform the promise made to his wife to be a fraud in law, and wrested the property from his heirs.

And in Keatts vs. Rector, 1 Arkansas Rep. 391, it was alledged in the bill, that Rector bought a certain tract of land at auction, and afterwards agreed to permit Keatts to become equally interested with himself in the land, and to receive the deed in his own name, upon condition that he should pay the purchase money, and should reconvey to Rector an undivided moiety, upon his applying therefor in a reasonable time and paying half the purchase money and interest, and half the value of all improvements. The court decided, that Keatts should reconvey according to his contract, although it was not evidenced by writing; and he pleaded the statute of frauds.

But it has been argued for the plaintiffs in error, that it is not allowable to show by parol proof, that the deed of December, 1824, from William E. to Joshua Kennedy, was made upon a secret trust, or that the land conveyed by it, should be disposed of in any other manner, than the grantee might think proper. That such evidence was inhibited by the statute of frauds and perjuries, which declares, that no action shall be brought, whereby to charge any person upon any contract for the sale of lands, tenements, or hereditaments; unless the pro-

mise or agreement, upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or some other person, by him, thereunto lawfully authorized. [Aikins' Digest 206, 7.]

And further, that the deed expressing upon its face, a specific monied consideration, and nothing else, it was not permissible to show, that there was any other inducement moving from the grantee to the grantor.

To sustain the first branch of the argument, many authorities have been cited.

The first we will examine, is the case of Lord Irnham v. Child & others, 1 Bro. Ch. Rep. 92. The facts of that case, are these : Lord Irnham treated for an annuity with Child, (who, though, unknown to Lord Irnham,) was an agent for H. Lawes Luttrell, his Lordship's eldest son. It was agreed, that the annuity should be redeemable; but both parties supposing, that if this appeared upon the face of the transaction, it would make it usurious, it was agreed, that the grant from Lord Irnham to Child, should not have in it a clause of redemption. The grant being drawn and executed according to the agreement, and the annuity assigned by Mr. Luttrell to others of the defendants, Lord Irnham filed his bill to redeem, alledging, that such was the agreement, although, for the reason stated, it did not appear upon the deed.

The Lord Chancellor, considered the rule perfectly clear, both upon the statute and at common law, that where there is a deed in writing, it will not admit of parol evidence of a contract, which is not part of the deed. If the contract reduced to writing had been varied by fraud, from the agreement of the parties, the evidence would be admissible; the Court would not, in that case, overturn the rule of equity, by varying the ded; but it would be an equity *dehors* the deed. But it having been agreed by both parties, not to introduce the clause of redemption, the deed executed was such as the parties understood and intended it to be; and the Court rejected the parol proof.

In delivering his opinion in the Marquis Townsend v. Stangroom, 6 Ves. Rep. 331, Lord Eldon said, " upon the question

as to admitting parol evidence, it is perhaps, impossible to reconcile all the cases. Lord Irnham v. Child went upon an indisputably clear principle, that the parties did not mean to insert in the agreement, a provision for redemption; because they were all of one mind, that it would be usurious; and they desired the Court not to do what they intended; for the insertion of that provision was directly contrary to their intention, but they desired to be put in the same situation, as if they had been better informed, and consequently, had a contrary intention. The answer is, they admit it was not to be in the deed; and why was the Court to insert it, where two risks had occurred to the parties; the danger of usury, and the danger of trusting to the honor of the party." Whether the insertion of the clause of redemption in the deed, would have made the transaction usurious, there was an intention to evade the statutes against usury, and a reliance by Lord Irnham upon the personal honor of Child; for these reasons, the rejection of the parol evidence was considered by *Lord Eldon* to have been proper.

The case of the Marquis Townsend v. Stangroom, does not maintain the inadmissibility of parol proof, to establish the fraudulent use of a deed; or that a party receiving an absolute deed, upon a promise that he would dispose of the property conveyed by it, for a particular purpose, refused to perform his promise. But it shows, that Courts of equity receive such proof in some cases, in which Courts of law do not.

In Leman v. Whitley, 3 Cond. Eng. Ch. Rep. 736, it appears, that the son conveyed an estate to his father, in consideration, as it was expressed in the deed, of £400, paid by the father to his son, the plaintiff. The bill alledged, that the plaintiff not being in good credit, but desirous of raising money upon a mortgage of this estate, was advised by an attorney, employed as well by the father, as the plaintiff, that he could much more readily procure the money on mortgage, if it appeared, that the estate on which the security was to be given, was the father's property, and that the money was raised for the use of the father, who was in good credit, than if the transaction was understood to be a dealing with the plaintiff; and, therefore the attorney recommended, that the plaintiff should

convey the estate to the father, so that it should appear to be his property. In pursuance of that advice, deeds of lease and release were made and executed to the father with his consent; but no part of the alledged consideration was paid.

The father died about five months thereafter, having, by his will, made subsequently to the deeds of lease and release, devised all his real estate in general terms, to an infant son of the plaintiffs, with remainder over.

The attorney had taken steps towards raising money on mortgage in the name of his father; but no mortgage was completed in his lifetime. The facts were admitted by the answer of the attorney, who was made a defendant to the bill; and they were also proved by his deposition.

The bill prayed that the devisees of the father might be declared to be trustees for the plaintiff; that they might account to him for the rents and profits since the father's death; and that the estate might be re-conveyed to him. The question was, as to the admissibility of the parol evidence.

The Master of the Rolls thought that there was no pretence of fraud, nor any misapprehension of the parties with respect to the effect of the instruments. It was intended that the father should, by legal instruments, appear to be the legal owner of the estate; and to allow the trust to be established by parol evidence, would repeal the statute of frauds. The case was then considered as a purchase from the plaintiff by the father; and it being stated and proved, that no part of the consideration of £400 was ever paid by the father, it was held that the plaintiff was entitled to a lien on the estate for that sum.

And in Morris v. Morris, 2 Bibb's Rep. 311, it was held, that a verbal promise from a son to a father, at the time of receiving a conveyance of land, to execute and deliver a bond to a third person, conditioned for the conveyance of one-half of the estate to the infant children of another son, could not be enforced in equity.

In respect to the case of Leman v. Whitley, Mr. Justice Story remarks, that it stands upon the utmost limits of the doctrine of the inadmissibility of parol evidence as to resulting trusts; and it will be seen that both that case and Morris v. Morris are

43

opposed to several of the authorities cited above; especially, the Lessee of Thomson et ux v. White.

The second branch of the argument supposes it not permissible to vary, by parol proof, the character of the consideration expressed. To sustain this conclusion, several decisions have been referred to. The case of Mead v. Steger, 5 Porter's Rep. 498, it is insisted, is decisive of the point. That was a cause at law; and it was not pretended that fraud was imputable to the plaintiff. The Court held, that parol proof of another and different consideration than that expressed, was inadmissible; but stated some of the cases in which such evidence would be received in a Court of law, in addition to, and in contradiction of, the writing. In a suit in equity, where fraud is charged, it cannot be regarded as an authority.

In Young v. Peachy, 2 Atk. Rep. 255, the Chancellor, in setting aside the recovery which had been suffered, laid stress upon the generality and looseness of the terms in which the consideration was expressed; and says it follows from thence, that it is competent for the parties to aver any other consideration. In that case, there was no. allegation or proof of fraud in fact; and though we infer from the reasoning of the Chancellor, that he would, upon other grounds than that stated, have admitted the evidence; yet he doubtless considered that his opinion acquired strength by calling to his aid a principle, which even Courts of law acknowledge.

In Watt v. Grove, 2 Sch. & Lef. Rep. 500, Lord Redesdale, speaking of the conclusiveness of deeds, says: "Solemn instruments, duly executed, are *prima facie* conclusive on the parties. Where they state truly the transactions on which they are founded, they are binding in equity, as well as at law, if the consideration stated is sufficient for the purpose. But if it appears, that transactions are not truly stated, the instruments may lose all their binding quality in equity, even if conclusive at law. Instruments may be so wholly false and fraudulent, that they may be avoided at law and become mere nullities. A court of law can hold no middle course. But if instruments are impeached in equity, the party who seeks to avoid them, although he may demonstrate that they are false and fraudu-

lent, that they do not contain the real dealing between the parties, yet resorting to a Court of equity for relief, he must submit to the rule of equity, and in the language of the Court, must himself do equity." Now here is a decision directly upon the question we are examining. All the authorities cited to show that where fraud is proved, a deed shall be set aside, or in the case of an absolute deed, equitable relief shall be administered, proceed upon the idea that the consideration expressed, is inconclusive. So the decisions which maintain that an absolute deed may be turned into a mortgage, whether they require proof of fraud or not, impliedly admit that the statement of a specific consideration interposes no barrier to the administration of an extrinsic equity. Slocum & wife v. Marshall et al., 2 Wash. C. C. Rep. 397; Dane's Ab. Ch. 9 art. 1 sec. 4.

It was argued for the plaintiffs in error, that even conceding the complainants were entitled to relief upon proof of fraud, yet the Court could not extend its decree so far as entirely to annul the deed of December, '24. That the only redress which the complainants could claim, was the recovery of the amount of the consideration expressed in the deed, (if unpaid,) with interest thereon. In refusing to set aside deeds for land upon an allegation of fraud, Courts have sometimes treated the complainant as a vendor, and upon proof that the purchase money was not paid, have given him the benefit of an equitable lien on the land for its recovery. See Leman v. Whitley, cited above; to which might be added other cases to the same effect. But in Boyce's ex'rs. v. Grundy, 3 Peter' Rep. 220, which was a suit in equity, by a purchaser, to be relieved from a purchase of land, on the ground of a fraudulent misrepresentation by the seller, the Court remarked, "It has been further argued, that the misrepresentation, if at all established, was but of a personal character, and susceptible of compensation, or indemnity, to be assessed by a jury. On this, there may be made several remarks; and first: That if the facts made out such a case, yet the law, which abhors fraud, does not incline to permit it to purchase indulgence, dispensation, or absolution." And this, both upon principle and authority, we consider the true doctrine. [See also Podmore v Gunning, 10 Conl. Eng. Ch. Rep. 219.]

It was further objected by the plaintiffs, that the bill does not charge Joshua Kennedy with having been guilty of a fraud, either in inducing Wm. E. Kennedy to execute the deed of December, '24, or in using it for a purpose other than that contemplated by the agreement of the parties.

It was not necessary to alledge the commission of a fraud *in totidem verbis.* If the bill states, with distinctness and precision, facts and circumstances which in themselves amount to a fraud, it is quite as unobjectionable, as if the very term itself was employed.

In Whelan v. Whelan, 3 Cow. Rep. 576, which was a bill to set aside two conveyances of land, on the ground of undue influence and fraud, it was objected, that the pleadings were not sufficiently explicit to admit proof of undue influence. But the Court said, "The bill charges the respondents with fraudulent artifices, management and undue influence, in obtaining the deeds. It is however sufficient if, from an examination of the whole bill, the facts shew that the respondents' necessarily had undue influence or control over the appellant, so that the appellant did not treat on equal terms. The rule that requires every thing essential to the appellants' right to be alledged, is then satisfied. His equity will then appear, and the Court may administer the relief to which he is entitled." To the same effect, see Story's Eq. Pl. 212.

While it is proper that every material fact to which the plaintiff means to offer evidence, should be distinctly stated in the *premises,* a general charge or statement is sufficient. It is not necessary to charge minutely all the circumstances which may tend to prove the general charge; for these circumstances are matters of evidence, and need not be charged with particularity. [Story's Eq. Pl. 24–5; Smith v. Burnham, 2 Sumner's Rep. 612.]

It is stated in the bill, that William E. Kennedy died on the 9th May, 1825, at the house of Joshua, his brother—That after the death of his wife, (which occurred three or four years previously,) himself and children, with the exception of Delphine, went to reside with Joshua—That William at all times reposed great confidence in the honesty, integrity and faithfulness of his brother, who was in the habit of acting as his agent, con-

sulting and advising him in all things as to the management and disposition of his property—And after the death of his wife, Joshua assumed the place of guardian to him during life.

In the latter part of his life, William became intemperate, and was frequently intoxicated; and when in that condition, would convey his property without any, or for a very inadequate consideration, to any one who would ask him.

It is further stated, that Joshua, together with other relatives of William, after consultation, came to a conclusion that it would be best to advise him to convey his property, or the greater part of it, to Joshua; and that after repeated solicitations by them, he executed the deed of December, 1824. That deed, though absolute on its face, and purporting to be for a moneyed consideration paid in hand, was made in trust for the children of William, without any other consideration than confidence in Joshua, and so admitted by him up to a short time previous to the commencement of this suit. The deed was not recorded until November, 1828. The bill then states some circumstances tending to show that the means of Joshua could not have been very great; and alledges, he could not have paid ten thousand dollars, or any considerable part of it. It is also averred, that the expenditures of William from December, '24, to May, '25, were not extravagant; and that he left but one hundred and one and eighteen one hundredths dollars in cash at the time of his death.

It is stated, that Joshua received the conveyance from William upon an assumption and promise, that the property conveyed should be held or disposed of in trust for the children of the latter; that notwithstanding all which, he failed during his life to convey it to the children, or otherwise dispose of it for their benefit, but asserted an absolute title in himself.

The facts recited clearly amount to an allegation—1. That William was very much under the influence of Joshua, in the management of his property, at the time the deed of December, 1824, was executed. 2. That Joshua and other relatives advised William, as a means of securing his property to his children, to execute that deed; that it was executed under the influence of an assurance from Joshua, that the property should be held and disposed of for the benefit of the children; that he

not only failed to perform his promise, but set up a title in himself. That these allegations are equivalent to a direct and positive charge of fraud, it seems to us is scarcely disputable.

It was argued for the defendants in error, that the great confidence which William manifested in the integrity and prudence of Joshua, and the control which Joshua seems to have exercised over him and his property, should go far to warrant the conclusion, that William was overreached in executing the the deed of '24. There was certainly no confidential relationship, such as trustee and *cestui que trust*, principal and agent, &c., existing between the parties, from which Courts of equity are apt to presume fraud. (2 Phil. Ev. C. & H.'s ed. 301, 336 –7.) But even if Joshua could be regarded as occupying such a relation to William, yet he might have made a purchase of him, if he made a full and fair disclosure of his knowledge, and took no improper advantage. [Randall v. Errington, 10 Ves. Rep. 442; Lord Selsy v. Rhoades, 1 Cond. Eng. Ch. Rep. 339; Lovell v. Briggs, 2 New Hamp. Rep. 218; Bolton v. Gardner, 3 Paige's Rep. 273.]

But it is said there are other relations of a miscellaneous character, from which Courts of Equity have gone far in presuming fraud. To this point, Whelan v. Whelan, 3 Cow. Rep. 537, is a leading case. There it appears that a man aged 74 years, whose wife was sickly and irritable, was troubled for several years with dissensions among his children about the management of his property—his wife taking part with all his children on one side, except two of his sons, who took part with him. The dissension was so great, that the wife, and children taking part with her, departed, leaving the husband and two sons with him. The father being sued for a debt contracted by his wife, became alarmed by a belief that she would dissipate his estate; one of his sons induced him to convey to them in fee more than nine thousand dollars of real and personal property—they agreeing to secure to him and his wife a maintenance and fifty dollars a year for life. Among other grounds on which the conveyance was set aside, it was held to be void, as being caused by fraud, undue influence and unfounded alarm, excited or countenanced by the son. The doctrine in regard to undue influence exercised by a vendee, is most ex-

tensively examined in the learned arguments of counsel and in the opinion of the Court; and it was decided, that " a conveyance obtained by children from a father, will not be sanctioned by a Court of equity, if it appear to have been caused by an abuse of confidence reposed by him in his children, who for the purpose of procuring it, took advantage of his age, imbecility and partiality for them"; more especially, if the consideration is inadequate.

In Slocum & wife v. Marshall et al., 2 Wash. C. C. Rep. 397, it appears that a daughter, at the request of her father, had made a conveyance of her real estate to him, under the belief that her interest would be thereby promoted, and that the property conveyed would become hers after the death of her father. But the operation of the conveyance was to deprive the daughter of the estate. The Court decreed a re-conveyance of the property, and an account of the proceeds of the part which had been sold, so as to effect the justice of the case, and to give to the daughter the property to which she would have been entitled if no conveyance had been made. The Court thought there was abundant evidence in the cause to repel the imputation of a fraud intended by the father; but thought it obvious that the conduct of the daughter in the affair was influenced altogether by his declarations and advice, in which she appeared to " have placed the most implicit and respectful confidence." Yet as the conveyance, instead of being promotive, was destructive of her interest, the relief sought against the act of the daughter was granted.

The case cited is an authority to show, that where one who is so much under the influence and control of another as to regard his advice as almost authoritative, is induced to make a deed for land to that other, under the promise of some benefit which is never received, the deed will be set aside, although a positive fraud is not shown. And if precedent has ascertained the law correctly on this point, there can be no doubt but the undue exercise of an influence resulting from confidence and friendship, exerts great potency upon an application to equity to rescind a contract. The doctrine being, says Mr. Justice Story, that wherever confidence is reposed, and one party has it in his power, in a secret manner, for his own advantage, to

sacrifice those interests which he is bound to protect, he shall not be permitted to hold any such advantage. [1 Story's Eq. 319–20.] The reason of the doctrine being this, that while one party has been put off his guard by his confidence, the other by the aid of that confidence, has gained an advantage, that would not have been voluntarily yielded to him. [Hall v. Perkins, 3 Wend. Rep. 626; Gore v. Summersall, 5 Monroe's Rep. 505; Bates v. Graves, 2 Ves. Rep. 287; Ex parte Fearon, 5 Ves. Rep. 644; Norton v. Kelly, 2 Eden's Rep. 286; Watkins v. Stockett, 6 Har. & John's Rep. 442; Watt v. Grove, 2 Sch. & Lef. Rep. 492; Young v. Peachy, 2 Atk. Rep. 258; Purcell v. McNamara, 14 Ves. Rep. 91.]

It was further insisted for the plaintiffs in error, that the Chancellor should have sustained their demurrer to the bill on the ground that it was multifarious in seeking by the same suit to set aside the deed of 1824 from William to Joshua Kennedy, and to obtain a settlement of the accounts of the latter as the executor of the will of William—that though the heirs were necessary parties to a contestation upon the first branch of the complaint, yet the executors could only be called upon to answer the latter.

In a litigation respecting the real estate of a testator or intestate, it is necessary that the heirs should be parties; and perhaps where the powers given to the executors are as extensive as those conferred by the will of Joshua Kennedy, the executors should be joined as defendants in equity. But in order to coerce a settlement of the accounts of an executor, his executor is the only necessary party, inasmuch as the personal estate is primarily liable to the payment of what may be found due.

In the case under consideration, the amount of the decree in money must depend upon the fact, whether the deed of December, '24, is set aside as being intended for the benefit of the children of William; for the bill alledges that considerable sums of money have been received for rent of the property conveyed. The question then is, shall the validity of that deed be tried in a separate suit, and in the event it is set aside, the accounts of Joshua as executor be finally adjusted in a proceeding against his executors.

Equity delights to prevent multiplicity of suits; and with that view, frequently entertains bills by complainants, between whom there exists no privity of contract; and against defendants, between whom there exists no connection whatever, except a community of interest. Thus it is in the case of a bill by creditors, to subject a fund to the payment of debts, and of "bills of peace" generally.

The first branch of the argument upon this point assumes it as a correct principle, that distinct matters cannot be united in the same suit. This "proposition, if carried to its full extent, would go to prevent the uniting several instruments in one bill, although the same parties were liable in respect of each, and the same parties were interested in the property, which was the subject of each." "It would be extremely mischievous if such a rule were established, in point of law. No possible advantage could be gained by it, and it would lead to multiplication of suits in cases where it could answer no purpose to have the subject-matter of the contest split up into a variety of separate bills." (Campbell v. Mackay, 1 Milne & Craig's Rep. 603.)

The objection of multifariousness, it is said, must be confined to cases, where the case of each defendant is entirely distinct and separate in its subject-matter from that of the other defendants; for the case against one defendant may be so entire, as to be incapable of being prosecuted in several suits; and some other defendant may be a necessary party to some portion only of the case stated. In the latter case, multifariousness would not be an available objection. [Story's Eq. Pl. 2nd ed. 225; Attorney Genl. v. Craddock, 3 Milne & Craig's Rep. 85.]

It is indeed difficult, if not impracticable, to reconcile all the decisions on this subject, or to educe from them general rules by which to test the objection. Without attempting to cite them, it may be said with truth, they are extremely various; the Courts seeming to be influenced by what was convenient and just in the particular case, rather than lay down any inflexible rule; always discouraging the objection, where, instead of advancing, it would defeat the ends of justice.

By the term multifariousness, as applied to a bill, we are to understand, that a defendant has been made a party, though he has no connection with a large portion of the case stated in the bill. [See Story's Eq. Pl. 407, 2nd ed., note.] But where there is a common liability in the defendants and a common interest in the plaintiffs, different grounds of complaint may in *general* be united in one record.

But it is said that although the plaintiffs and defendants are parties to the whole transactions which form the subject of the suit, yet those transactions may be so dissimilar, that the Court will not allow them to be joined together; but will require distinct records. [Story's Eq. Pl. 406, 2nd ed.]

In Kensington v. White, 3 Price's Rep. 164., a bill was filed by seventy-two underwriters to restrain several actions on different policies effected upon different ships. The defendants had a common interest in all, because they were the owners of the ships and plaintiffs in all the actions; but here were seventy-two individuals all not only liable to separate actions, but actually defendants in separate actions, united together against the parties who were plaintiffs in all the actions, for the purpose of obtaining by one bill a discovery in aid of the defence against all the actions; yet the Court of Exchequer held, that the suit was not multifarious.

After an extensive examination of the subject, Mr. Justice Story says : " The conclusion to which a close survey of all the authorities will conduct us, seems to be that there is not any positive inflexible rule as to what, in the sense of Courts of Equity, constitutes multifariousness, which is fatal to the suit on demurrer. These Courts have always exercised a sound discretion in determining whether the subject matters of the suit are properly joined, or not; and whether the parties, plaintiffs or defendants, are also properly joined, or not. And it is not very easy, *a priori*, to say what is, or what ought to be, the line regulating the course of pleading on this point. All that can be done in each particular case, as it arises, is to consider whether it come nearer to the class of decisions, where the objection is held to be fatal, or to the other class where it is held not to be fatal. And in new cases, it is to be presumed that the Court will be governed by these analogies

which seem best founded in general convenience, and will best promote the due administration of justice, without multiplying unnecessary litigation on the one hand, or drawing suitors into needless and oppressive expenses on the other." And such is substantially the language employed by Lord Cottenham, in Campbell v. Mackay, 1 Milne & Craig's Rep. 603.

The object of the rule against multifariousness, says Lord Cottenham, is to protect a defendant from unnecessary expense. (The Attorney Genl. v. Craddock, 3 Milne v. Craig's Rep. 85.) In the case at bar, by uniting in the same record the heirs and executors, instead of increasing the expense, such a consequence will be prevented. So long as the executors have assets to pay costs, it is unimportant to them *individually* what the amount of costs may be; but to the heirs, it is all-important, as their ancestor's estate must ultimately contribute to its payment. Again; by contesting the validity of the deed, and asking an adjustment of the accounts of William Kennedy's executor in the same suit, a final settlement and division of the estate of Joshua Kennedy will be expedited. So that upon the score of expense, as well as the speedy administration of justice, the plaintiffs are really benefitted. Upon this consideration then, as also the fact that the settlement of the accounts of Joshua Kennedy as executor are intimately connected with the controversy in respect to the deed, we are of opinion, that the bill is not objectionable for multifariousness. (Story's Eq. Pl. 224 to 234, and 405, '6, '7—412 '13, '14, 2nd ed. and cases cited.) This view closes our opinion upon the law of the case, and we are now to consider the second question raised, which opens an inquiry into the facts.

*Second :* The lands conveyed by the deed of December, 1824, are such parts of the McVoy and Price grants, (as they are designated,) as then belonged to William E. Kennedy. These grants emanated from the Spanish authorities exercising jurisdiction over the city of Mobile and country adjacent, at the periods of their respective dates.

The land embraced by the grant to William McVoy, was conveyed by the grantee in 1814 to William and Joshua Kennedy jointly.

In 1798, Thomas Price obtained his first grant from Gov. Gayoso for six hundred arpents of land.

On the first of September, 1806, Joshua, as the agent of Thomas Price, petitioned the Intendant General at Pensacola for five hundred arpents of land, " by way of sale." The petition was granted, and the usual order made for a survey.

On the 20th November, 1806, Price, by his memorial addressed to the Commandant at Mobile, admitted that he had appointed Joshua an agent at Pensacola to obtain for him a further grant of five hundred arpents of land, in consideration of the arrears of his salary for three years as interpreter, and of other claims which he had on the Government. But he disavowed the authority of Joshua to purchase lands for him ; and stated, that the land granted upon the petition by Joshua, was embraced by the grant made by Gov. Gayoso in 1798, and solicited in consideration of the premises, a grant for five hundred arpents adjoining the then town of Mobile, (the boundaries of which he particularly described.) The memorial was granted by the Commandant, and confirmed by the Intendant General of Pensacola, who directed the usual order for a survey to be issued. This tract, on the 22d November, 1806, was conveyed by Price to William E. Kennedy ; and on the 24th of the same month, he made to William an irrevocable power of attorney to cause the necessary survey to be made. The consideration of this deed was two hundred dollars.

On the 25th August, 1813, Price executed a deed to William for the land granted by Gov. Gayoso in 1798; which deed recited as its consideration the sum of five hundred dollars paid by the latter to the former. Both the grants to Price were confirmed by Congress after the death of William E. Kennedy.

It is argued for the plaintiffs in error, that although William received conveyances from Price for the two grants to him, yet the purchase was made by William for the benefit of, and with the money of Joshua—that the latter not being a Spanish subject, was not authorized to purchase lands within the territory of Spain, while Wm. possessed the necessary qualifications; and therefore he acted as his agent. If this argument was sustained by proof, a resulting trust would probably have arisen

in favor of Joshua; but so far from being sustained, the evidence against such a conclusion strongly preponderates.

The deeds from Price to William are *prima facie* evidence (and conclusive until disproved) that the purchases by William were made on his own account and with his own means; and opposing evidence should not be merely conjectural, but clear and satisfactory.

It may be that Joshua Kennedy was not authorized to purchase land within the dominions of the king of Spain, as has been suggested. Be this as it may, the record shows, that in the year 1806, he received several conveyances before the Spanish Commandant at Mobile for lands within or contiguous to that city.

Between the years 1815 and '20, William conveyed small portions of the Price grants to Joshua, at different times. In some of the deeds, the consideration expressed is money paid—in others, the general terms, "valuable consideration." And on the 20th November, 1818, he conveyed to Joshua eighty arpents of land, part of the Price grant, in consideration "of the sum of five hundred dollars to me (him) formerly paid at the time of purchasing a tract of land from Thomas Price by William E. Kennedy." William also made nearly one hundred deeds to other persons to portions of the Price tracts, between the years 1817 and the latter part of 1824; and during the same period, some portions of the land were conveyed by William and Joshua jointly, and some by Joshua individually.

In 1818 or '19, it appears that a deed dividing the Price tracts between William and Joshua, was executed by them. The deed was accompanied by a map prepared by one Mathews, on which the lots set apart to each, were marked with the initials of their names respectively. The deed was not produced at the hearing, nor any proof offered as to its existence or loss; but a map, the counterpart of that supposed to have been made by Mathews, is still extant, and forms a part of the record of the cause.

Again; although some of the witnesses go so far as to express the belief, that William's purchase of Price was made for Joshua, yet there are others who express an opposite opinion, and state, that William was able to have paid for the land

without the aid of Joshua. Sefroy Dolive, a connection, and doubtless intimately acquainted with William's business, says confidently and almost positively, that the purchase was made by and for William individually.

Thus stands the question upon the proof; and we think that, apart from the potency to be accorded to an absolute deed in the scale of evidence, the circumstances greatly preponderate against a resulting trust for Joshua.

Let it be conceded that, in consequence of a want of citizenship in Joshua, he could not have purchased the land granted to Price during the continuance of the Spanish Government, and still it will avail him nothing. That cause did not exist in August, 1813, at the time William received the conveyance for five hundred arpents; for the Spanish had given place to the American flag in April of that year; and the ordinance of Congress and the legislative acts of Mississippi became the law of property; and consequently the right of Joshua to hold land, undoubted.

Can it be supposed, that a man so well informed of his rights, and watchful of his interest as Joshua Kennedy, would not, if William had been his agent in 1806, as soon as the Spanish Government had ceased to exist, have endeavored to obtain an absolute conveyance from him. But the record, instead of authorizing the inference, that the beneficial interest was in Joshua, tends to a different conclusion; for between 1815 and '20. Joshua received conveyances for money and other valuable consideration from William, for small portions of the Price grants. These deeds are, at least presumptive evidence of the facts recited, and are recognitions of the proprietorship of William, and of his right to sell.

The consideration of both deeds from Price to William, is stated at seven hundred dollars—two hundred for one, and five hundred for the other. In 1818, we have seen that a deed was made from William to Joshua, for eighty arpents of land, in consideration of five hundred dollars, paid by Joshua to William, at the time the latter purchased "a tract of land from Thomas Price." Now suppose, that Joshua had actually advanced to William the sum stated, it does not follow, that the latter agreed to invest it in land for the benefit of the former;

but even, if there was such an agreement, did not Joshua absolve William from all obligations to perform his promise, by receiving payment in the eighty arpents of land conveyed to him? Such, at least, is the natural conclusion.

But if it be true, that William's purchases of Price were made for Joshua, and with his money, why did Joshua execute with William a deed of partition to the Price tracts, and cause a survey and map, to be made to designate the property of each. If, entitled to all, why receive a deed for a part. Here, we think, was a distinct recognition, that William was entitled to a moiety of these lands, which then remained unsold.

It was, however, said, that Joshua must have been the owner of the Price tracts, previous to the execution of any deed by William to him, or he would not have conveyed portions of it in fee-simple. The conclusion by no means follows the premises. None of these deeds are made to William, so that he does not recognize the title of Joshua, and his heirs cannot be concluded by the act of a third person. The proof shows the greatest intimacy to have existed between Joshua and William—the latter to have reposed the fullest confidence in the former; the active interference of Joshua in the management of his brother's business; and the inconsiderable value of real estate in Mobile, previous to 1824. These circumstances incline us to think that the deeds were made by Joshua, in virtue of the general authority, which William yielded to Joshua over his property. We are then, constrained to conclude, that the purchases made by William E. Kennedy from Price, were not only conveyed to him individually, but for his own account and benefit.

This brings us to an examination of the deed of December, 1824. The question in regard to that deed is, was it made upon the consideration it imports, or upon some secret trust, that the land conveyed should be disposed of, for the benefit of William or his heirs.

The testimony of both Sefroy and Louis Dolive is exceedingly direct and explicit. These witnesses being nearly connected with Wm. E. Kennedy, and feeling as they must, the deepest interest in the welfare of his children, it was natural,

that they should have been advised of any disposition made by him of his estate. It was quite as natural, that Joshua always a devoted brother, should have been equally desirous of seeing the children of Wm. provided for, from their father's estate. Circumstances had then recently arisen, and were still increasing, to awaken the solicitude of relations. Wm. quite advanced in life, abandons as a means of livelihood, the practice of medicine, which he had hitherto pursued—the home at which he had lived with his wife and children, was broken up—in short, he almost loses his individuality in society, and abandons himself to habits of intemperance. In this condition of affairs, his fortune is likely to become a wreck; when his two brothers, brother-in-law, and other friends, consult together, with the view of devising means to save his estate for his family. Joshua is made the organ of communicating to Wm. the result of their deliberations. Wm. follows their advice, and executes the deed of December, '24, for the benefit of his children. Joshua admits that Wm's. property has been secured to his children, and that they will be wealthy. Such, in substance, is the evidence of the Dolive's. The testimony of Samuel H. Garrow, Daniel Robertson, Cyrus Sibley, Chester Root, Joseph Krebbs, John Shelton, Gorham Davenport, and Thaddeus Sanford, are strongly confirmatory of the Dolives', and relate facts utterly incompatible with the idea, that in receiving the deed of '24, Joshua Kennedy occupied any other position than that of a mere representative of William's children.

The testimony of a witness, who speaks postively to a fact is entitled to more consideration than several witnesses, whose statements are merely negative. Of the former character, is the evidence of the Dolives', and most of the witnesses who sustain them,—while the greater number of those who testify in opposition to them, merely state, that they were well acquainted with William and Joshua Kennedy—never heard them say that the deed of '24 was intended to secure the property conveyed to the children of the former; that had such been their intention, they believe they would have heard it. Such evidence is too loose and inconclusive to overturn the positive declarations of respectable witnesses.

But it is argued for the plaintiffs, that the health of Joshua was so bad at the time the deed bears date, as utterly to forbid the idea, that Wm. had conveyed to him in trust for his children. That Joshua Kennedy was in delicate health both previous and subsequent to 1824, we think, is apparent from the proof; but that there was about that time a rapid decline, which seemed to forbode an early death, is hardly probable. True, some of the witnesses suppose, that there were symptoms of the rapid approach of a pulmonary disease; while others equally well acquainted with him, discovered no material change. Again, some of the witnesses suppose, that the object of his visit to Havanna, was the improvement of his health; while some suppose, that the end proposed was twofold, viz: the restoration of health, and the examination of Spanish archives touching land titles at Mobile; and others believe that the sole object was the examination of land titles.

That Joshua's health was bad, cannot be questioned, but that it was such to induce an anticipation of a speedy dissolution, on the part of his brother and family, is what we cannot believe. The vessel on which he went out, and others leaving about the same time, carried for him eighty thousand feet of lumber, for the Havanna market; yet there accompanied him no member of his family, agent, or servant, to dispose of his lumber, or to attend him in his affliction. That Joshua Kennedy's means well enabled him to bear the increased expense of an agent or servant, cannot be doubted; that the affection which his family and brothers cherished for him, should not have prompted some one of them to accompany him, if his health was so desperate as is now represented, is indeed unaccountable.

It was quite natural after the deed of 1824 was executed, for Wm. to refer persons desiring to purchase to Joshua; the object of that deed was to divest himself of all title, and to provide for his children. Louis Dolive explicitly states that he was informed by Joshua, that Wm. had conveyed to him all his property by a deed of trust; that he had the entire management of it, and the children would have plenty of land. Many of the witnesses testify as to the great influence of Joshua over Wm.—some say he leaned on Joshua—others say Joshua

44

seemed necessary to his support—one says that he had as
much influence over him as a father over his child; and ma-
ny concur that Joshua had the entire management and control
of William's property. . Considering then, the confidence
which William reposed in Joshua; the uncertainty and com-
paratively small value of his title to the Price tracts; the
knowledge which Joshua possessed of Spanish titles, it is not
at all surprising that William should have invested him with
his right, upon an assurance that he would endeavor to con-
summate the title, or otherwise dispose of the property for his
children.   Upon the consultation between Joshua, Joseph and
the Dolive's we are informed that it was thought best that
William should convey to Joshua.   This shows that William's
friends considered such a measure proper and likely to meet
his approbation, or they never would have advised it.   Joshua
in repeated conversations, not merely casual or accidental, but
sometimes with friends, with whom he most probably com-
muned freely, spoke of the conveyance from William to him,
for the children of the former.   The credibility of none of
these witnesses has been assailed, and the majority of them, so
far as the record informs us, are not connected with either
party.   The repeated declarations of Joshua, together with
the circumstances we have related, all tend to show, that the
deed to him was not made upon the ground of a purchase, but
was intended as a means of securing to the children the pro-
perty of their father.

But is argued for the plaintiff's in error, that the declara-
tions of Wm. E. Kennedy show that Joshua paid him an ade-
quate pecuniary consideration for his interest in the Price
tracts, at the time the deed was executed, or that the convey-
ance was induced by the extinguishment of claims which Jo-
shua had against him.

Several of the witnesses examined by the plaintiff's in er-
ror, speak of admissions by William after December, '24, that
a settlement had been made between Joshua and himself.   Mr
Kitchens, the elder, states, that he was in Mobile after the de-
parture of Joshua for Havanna, when a report reached there,
that he had died on the outward passage; upon which occa-
sion he had a conversation with William, who told the wit-
ness that a settlement had been made between himself and his

brother. William seemed pleased that he had settled with his brother; inasmuch (as he said) there could be no controversy between himself and Joshua's children, should the rumour of their father's death be true.

Mr. Lane testifies that in the latter part of 1824, he met with Wm. E. Kennedy, who told him, that he had come across the bay (to Mobile we suppose) to settle with Joshua—that he had effected a settlement with him; and that any of his lands he might desire, he could purchase of Joshua, whose title would be good.

De Large states that in the latter part of '24 or early in '25, he applied to William to purchase a piece of land, who told him he had sold all to Joshua, and had nothing to do with it, but would go with him to Joshua and ask him to sell witness the land. They looked for, but could not find him.

It is difficult to reconcile the testimony of Kitchens, with the repeated declarations of William and Joshua, previously and subsequently made to other persons, upon any other supposition, than that a writing was executed declaring the terms on which the deed was made. But let it be conceded, that the declaration was made by William in the terms in which the witness has stated, and yet, it cannot be allowed to outweigh the statements, both of himself and Joshua often made as to the inducement to and purposes to be effected by the deed of 1824.

In respect to Lane's testimony, instead of opposing the idea of a secret trust for William's children, it is entirely consistent with it. The testimony of the Dolive's show a settlement by the conveyance to Joshua; and other witnesses show, that Joshua was in the habit of selling parts of the Price tracts, and that William recognized his right to sell—but for the benefit of the children doubtless. Now, as to the testimony of De Large, it can exert no influence against the declarations of Joshua, and other witnesses which serve to explain and direct its meaning. It is clear that William did not after December, '24, undertake to sell any part of the land conveyed to Joshua. Such an act on his part would have been incompatible with the purposes of his deed. As to the expression that he, William had "sold" to Joshua, if in itself entitled to any force, it is sufficiently shewn by the evidence of the Dolive's and oth-

ers, what was meant by it.　But we should think, that at this distance of time, the witness would not undertake to say, that William in the conversation referred to, did not use the term "transfer" "assign" or some other of equivalent import in common parlance.

It is further argued for the plaintiffs, that the deed of 1824, is sustained by the consideration expressed on its face ; that in 1797, Wm. E. Kennedy was prosecuted, tried and acquitted in South Carolina, for the murder of Colonel Maxwell ; that the expenses consequent upon that prosecution amounted to near ten thousand dollars, and were paid by Maxfield Kennedy his brother ; and that upon a settlement at Mobile in 1820, between William and Maxfield, Joshua undertook to pay the latter, between nine and ten thousand dollars (sixteen hundred of which has been paid.)　In consideration of Joshua's promise, William was to convey to him real estate in Mobile. These facts are all related in a deposition of Maxfield.

Waddy Thompson, sen'r. who (though it is not shewn by the record) has been a distinguished lawyer of South Carolina, states, that he was present at the Court, when Wm. E. Kennedy was tried for the murder of Col. Maxwell ; and that the expenses of his defence could not have exceeded *five hundred dollars*.　*And further*, that he knew Maxfield Kennedy, and that he could not have paid either in cash, or with his credit the one-hundredth part of the sum　that he says Joshua assumed for William.

Mr. Aikin had a conversation with Joshua Kennedy in 1836, in which the latter spoke of his advance to Maxfield, not as the payment of a debt, but as the witness understood, solicited by Maxfield and given by Joshua *as a mere gratuity.*

Several witnesses, who testify to Maxfield's condition as to property at this time and many years back, represent him as never having had much, and for many years very poor.

We will not undertake to say, that Maxfield Kennedy's testimony is not literally true ; but opposed as it is by other witnesses, whom it is presumable are quite as free from bias as himself, it defies all credence.

Can it be believed, that if Joshua had been the debtor of Maxfield, and the kind and affectionate brother, which Maxfield and others represent him to have been, that he would not

long since have paid him to the uttermost farthing. Joshua was wealthy, while Maxfield, since his residence in this State (which perhaps exceeds twenty years,) has never, says a witness well acquainted with his situation, had more property at one time than would pay his debts—he was always straitened with a large family to support. If Joshua owed him nothing, an extended benevolence would have prompted him to do quite as much as he did.

In conversations of Joshua Kennedy, which are related by the different witnesses, he never intimated that he had purchased the Price tracts, or that they had been conveyed to him in consideration of his engagement to pay Maxfied a demand against Wm. E. Kennedy. But he insists that he had obtained the grants for Price, and purchased them from him; and that William was made a mere depository of the title, because he was a Spanish subject. This pretension, instead of being sustained by evidence, we have seen is entirely disproved.

The idea that Joshua Kennedy should have paid the consideration expressed in the deed, is incredible in the extreme. Wm. E. Kennedy was a man of frugal habits; cultivated a small farm. and was a popular practitioner of medicine, especially among the native population ; he also received with his wife several slaves, and from her father's executor at one time more than two thousand dollars. These sources of income, together with the large amount of money he must have received from the sale of portions of his land, doubtless furnished him a competency for the support of his family.

So far from William being the debtor of Joshua, the reverse would rather seem to be true. Several deeds accompanying the record show, that Joshua between 1818 and 1824, sold parts of the Price tracts, allotted on Matthews map to William, for considerations expressed in the deeds, amounting to more than five thousand dollars.

Without extending this argument, we think it may be said, that it has been sufficiently shewn, that Joshua paid no consideration for the deed of 1824, but received it upon a promise, that the land conveyed should be held or disposed of for the benefit of the heirs of Wm. E. Kennedy.

We here close the view, which we have felt it our duty to take of this very interesting and important cause, with some

general remarks. As we are of opinion, that the facts establish a fraud in obtaining the deed of December, 1824, or in perverting it to a purpose in opposition to the agreement between the grantor and grantee, and that it should consequently be set aside; the doctrine of trusts, or rather the manner in which they shall be declared need not be examined.

.The failure of the proof to show with exactness, the terms on which the conveyance was made and received, can interpose no objection to setting it aside, though it may render it impossible to execute entirely the intentions of the grantor. If the law were otherwise, the grantee and his heirs might have acquired an indefeasible estate, without having paid any equivalent therefor. The objection then, that the parol stipulation in regard to the property conveyed, does not appear, has no foundation in moral justice; the more especially, as it was entirely competent for the plaintiffs in error, to have shewn every term which they esteemed beneficial to themselves.

Upon setting aside the deed, the rights of both parties must be protected. If Joshua Kennedy expended money, in order to perfect a title to the Price grants or other part of the land conveyed, these expenditures so far as they were necessary or proper must be reimbursed with interest, together with a just compensation for his time, &c.

So if in the settlement of his guardianship accounts, his liberality in providing for the maintenance of his wards without charge, was not intended as a mere boon, but was induced in consideration of the deed of 1824; that deed being set aside, his executors will be allowed to exhibit a proper charge against the defendants in error.

Though there is nothing in the record to cause us to doubt, that the deed in question was made upon a secret trust, for the benefit of the complainants, yet we desire in nothing we have said, to reflect upon the memory of Joshua Kennedy. It is an ignoble and disingenuous spirit which prompts one to speak unkindly even of the living, and it is much more reprehensible to indulge terms of harshness of the dead. Joshua Kennedy in common with other men had his faults, and may have been the victim of temptation; but he has left behind him the remembrance of some noble traits of character; he

was industrious, temperate, energetic, persevering and affectionate to his relatives. These are virtues which stand out in bold relief and cover a multitude of faults.

Without extending this opinion to greater length,' by a recapitulation of the points decided, we have only to say, that the decree of the Court of Chancery is affirmed.

After the delivery of the foregoing opinion, GEO. N. STEWART, one of the counsel for the plaintiffs in error, presented to the Court a petition for a re-hearing; in support of which he cited the following authorities Gresley's Eq. Ev. 401, 123; 3 Swanton's Rep. 344; 1 Tamlyn's Rep. 63; 2 Sim. & Stu. Rep. 301; 16 Ves. Rep. 156; 2 Bro. Ch. Rep. 345;' 9 Ves. Rep. 168; 2 Ves· Rep. 486; 1 Merivaile's Rep. 308; 3 Bro. Ch. Rep. 228; 1 Eden's Ch. Rep. 256; 1 Bro. Par. cases 140; ibid 134; ibid 426; 6 ibid 364; 1 Ball. & B. Rep. 548; 2 ibid 387; 3 Merivaile's Rep. 466; 4 Ves. Rep. 769; 6 Ves. Rep. 671; 13 ibid 95; 1 Russell's Rep. 301; 2 Paige's Rep. 482; 1 Hopkin's Rep. 436; 2 Munford's Rep .412; 4 ibid 450; Gilmer's Rep. 211; 1 Rand. Rep. 249; 2 ibid 109; 2 Brock. Rep. 256; 1 ibid 266; 1 Dana's Rep. 93; 4 Call's Rep. 416; 6 Munford Rep. 245, 385, 459, 464; 6 H. & Johns. Rep. 24; 1 Bro. Ch. Rep. 92; 1 Porter's Rep. 349; 1 Gall. Rep. 170; 5 Johns. Ch. Rep. 1; 5 Ohio Rep. 255; 2 Ves. Rep. 196; 6 Ves. Rep. 327, 333, 4; 1 Ves. Rep. 317; 1 Bro. Ch. Rep. 341; 1 Johns. Ch. Rep. 252; 4 Rand. Rep. 54; 11 Vermont Rep. 138; Gresley's Eq. Ev.' 205; 1 Johns. Ch. Rep. 598; 2 ibid 412; 6 ibid 19; 10 Ves. Rep. 517; 6 Wend. Rep. 277; Aik. Dig. 2 proviso to 11 sec. p. 287; 2 Stewart's Rep. 214; 8 Dana's Rep. 212; 7 Gill & Johns. Rep. 193; 9 ibid 97; 6 Johns Rep. 222; 5 Cow. Rep. 714; 4 Munford's Rep. 450; 2 Rand. Rep. 109; Pamp. Acts of 1840, p. 46; 2 Fonblanque's Eq 720; 2 Ball. & B. Rep. 444; 1 P. Wm, Rep. 734; ibid 504; 2 ibid 403, note; 2 Atk. Rep. 487, 532; 2 S. & P. Rep. 427.