Judge Wright
delivered the opinion of the court:
The counsel for the complainants urge, in support of the bill: That inasmuch as it is admitted by the demurrer that the elder Fleming paid the purchase money for this lot and took a deed to his daughter Mary, and so vested in her the fee, that a trust resulted to her father.
It is a general rule that when a father purchases land and takes a deed to a child, it is prima facie an advancement to the child, the law presuming such to be the intention of the father. But this presumption may be rebutted, and wherever it expressly appears that the parent intended that the conveyance should not bo considered such, then the child takes a trust estate. 2 Mad. Ch. 112; 2 Johns. Ch. 51; 11 Johns. 107. The declarations of both the father and daughter set forth in this case are, perhaps, sufficient to rebut the presumption of law, that the conveyance to Mary was an advancement by her father.
But is there a resulting trust springing out of the facts set forth? If one pays the money for land purchased and takes a deed to another, a trust results, by implication of law to him who paid the money, because he is deemed the real purchaser. Thin *235 is analogous to a feoffment at common law, where the use followed,the consideration. 2 Atk. 150; 3 Stark. Ev. 1040. Where-an estate is purchased in the name of A., and the consideration money is actually paid at the time by B., there is a resulting-trust in favor of B., provided the payment of the money be clearly proved. The payment of the money at the time is indispensable-to the creation of the trust. 4 Kent’s Com. 300, and the cases *there cited. Lord Hardwick said, that a resulting trust arising by operation of law existed: 1. When the estate was purchased in the name of one person, and the consideration came from another. 2. When a trust was declared as to part, and nothing said as to the residue, that residue remaining undisposed of remained in the heir at law; and he observed that he did not’ know of any other instances of a resulting trust, unless in cases of fraud. 4 Kent’s Com. 300; 2 Atk. 71; 1 Johns. Ch. 582; 2 Johns. Ch. 405; 5 Johns. Ch. 1; 3 Lit. 399; 1 Cruise Dig. 311; Sug. Vend. 443.
To apply these authorities to the case in hearing, it is obvious that a resulting trust must arise, if at all, at the time the conveyance is made, and be certain. What is the state of things here ?' There is no pretense that those who seek to set up this trust ever-paid any money. Instead of a resulting trust the bill seeks to-make an estate for life to one with a remainder for another. The-trust set up in the bill is uncertain, contingent, complicated, and difficult to enforce ; one partly for the benefit of the grantee, and* partly for the benefit of some of the other children, in unequal proportions. A slight variation in the testimony of the witnesses, introduced to prove the trust, might either give the estate to the-two children who survived Mrs. Donahoo, or to such only as survived the father, or to all the heirs of the father. This case-made shows almost anything else than a resulting trust. Indeed the bill itself rests the claim of complainants on the express' declaration of the parties and their understanding at the time the deed was executed.
Does the bill, then, show a case of express trust, of a kind to let in proof, to sustain a decree for the complainant? If it does, it will be sufficient on the demurrer. We are of opinion it does. Proof may be introduced under the bill which might entitle the-complainants to relief.
Another question arises on the ease made. Can a trust in lands- *236 be created by parol, and proven by parol under a conveyance prima facie absolute? It is conceded, as a general principle, that a deed or written contract can not be varied by parol. But is this a case of that kind? The object of the conveyance is not intended to be expressed in the deed. The grant and consideration is only set forth. *No rule of the common law prohibited the creation of a trust by parol. No particular form of .words were necessary to create a trust. It was only necessary to express the interest of the party creating the trust. Such a trust was not ■ considered as varying the terms of the deed, but as setting up an independent contract consistent with it. The practice to go back of the deed to ascertain the real consideration paid is of every • day’s occurrence, and is familiar to all. Before the statutes of frauds and perjuries in England, unwritten contracts touching lands were enforced both at law and in equity. And after the passage of the law, contracts made before were enforced. 2 Showers, 17; 7 Johns. 434, 496; 2 Hayw. 131. The statute of frauds in Ohio was passed in February, 1810. The deed.in this case was executed in 1808. At that time there was no law in Ohio prohibiting parol contracts concerning lands or the creation of trusts in them. It is true at no time could á legal estate in lands in Ohio pass by parol. The creation of a trust in an estate passed by deed, does not conflict with this position.
If we are correct in these views, the demurrer must be overruled.
. The complainants requested us to look into evidence and decree on the merits, if the" demurrer wer.e overruled. We have done so. Cornelius Johnston heard both father and daughter say the deed was made to her because she was a cripple, and he wanted to place her above dependence and want during her life, and that at her death the property was to go to all the children except William. John Cummins heard both say the lot was deeded to Mary because she was a cripple, that she was to hold for life, and . at her death it was to go to such of the children as were not provided for by the father in his lifetime. James Wilson heard the father say Mary was to have the lot for life because 'she was a • cripple, and to prevent its being spent by the family. J. L. Wilson was called to write the old man’s will, when the old man said he ¡left Mary nothing because she was provided for, as she owned the dot. Henry Shane bought part of the lot, and the old gentleman *237 told him frequently and in the presence of the daughter, she was the sole owner, *and he bargained with her and paid her for the part bought. James E. Miller heard the daughter say she held the lot for life, and at her death it was to go to certain heirs, not recollected. Mary Merrel heard her say that her father' deeded to her because she was a cripple, and he wished to afford her a home during her life, not expecting she would ever marry; that she was to have it during her life, and at her death to go to-the heirs. Jane Fleming says it was pretty much understood in the family that the lot was given to Mary because she would never marry or have children, and at her death it was to go to her brothers. Elizabeth Lanphear understood the deed was made to-Mary because she was a cripple and she was to hold it for life. This is all the evidence tending to prove a trust or its extent. "Which of these various declarations are we to take as true?' They are all declarations made long after the deed, and shed little light on the real transaction. No certain trust can be deduced from it. It is probable the whole talk about the rights of any after the death of Mary Fleming rested on the expectation that she would remain single and die without issue, or having conveyed.
The bill is dismissed at complainants’ costs.