**BARNES, Estate of, In re.**

Common Pleas Court, Miami County.

No. 33206.   Decided March 21, 1952.

8

Robert A. Prince, Tipp City, for estate.
Merritt E. Schlafman, Dayton, for appellant.
Faust & Faust, Leo H. Faust, Troy, for appellee.

10

## OPINION

By PORTER, J.

This case involves exceptions to the inventory of the estate of Hattie E. Barnes, deceased. Hattie E. Barnes died intestate August 6, 1947 and her estate is at this time in the process of administration in the Probate Court of Miami County, Ohio. The inventory was filed in due course and the exceptions to it which are before the Court were filed by the heirs of George W. Barnes, the spouse of Hattie E. Barnes, who had predeceased her.

The exceptions were certified by the Probate Court to the Common Pleas Court by virtue of §10501-9 GC, and pursuant to §10501-10 GC, the case was submitted to Judge Klapp and testimony taken. Judge Klapp died after the case was heard but before it was determined and the exceptions are before the present Court by agreement of the parties for decision on the transcript of the testimony taken at the two hearings held before Judge Klapp.

This usually presents a problem, for the Judge deciding the matter on a transcript of testimony taken before another Judge is without the benefit of observations of demeanor and general appearance of the witnesses, which convey a great deal. However, this is no handicap in the present situation for much of the evidence is documentary and the balance is not controverted particularly.

The first inquiry which must be made is—what is the Court's power in this situation? Sec. 10501-10 GC provides that when a matter is certified to the Common Pleas Court as this one has been, the Court "shall hear and determine it as though it had original jurisdiction of the subject matter." What does this mean?

I conclude that it means that the Common Pleas Court shall have such power to hear and determine these exceptions as the Probate Court would have had if the matter had not been certified. To hold otherwise would give a Common Pleas judge to whom the matter has been certified more power than one who might be assigned to sit in the Probate Court.

The attorneys for the heirs of Hattie Barnes have made a request that the court separately state conclusions of law and findings of fact. This has been allowed, though his right

to do so is questionable since this proceeding has been certified from Probate Court and should be governed by the Code sections on practice in that court. Accordingly, the above conclusion may be called "conclusion of law No. 1." Before proceeding, however, to other conclusions of law it is best to make findings of fact. This is a difficult task. In it the Court has the assistance of a helpful brief furnished by the attorney for the exceptors. None was furnished by the attorney for the heirs of Hattie Barnes and this has placed a burden on the Court.

The record shows that George W. Barnes and Hattie E. Barnes were an elderly couple who lived in Tipp City, Ohio. They were childless and the closest relatives which each had were brothers and sisters. The exceptors showed that Mr. and Mrs. Barnes were concerned for a long time about the ultimate disposition of their property. This concern grew out of the fact that they had no children and the further fact that they wanted their property not to go to one's brothers and sisters to the exclusion of the other's brothers and sisters. They evidently knew that this would happen if one predeceased the other and some plan was not devised to assure that their respective brothers and sisters would share equally in the unconsumed estate remaining at the death of the survivor.

Mrs. Barnes made statements to her attorney, Mr. Prince, after her husband's death which convinced him that she and her husband "intended that their property pass equally to the heirs on his side and to the heirs on her side" (R. 17). As to this intent or agreement that the parties had with reference to their property Mr. Prince did not recall whether real estate as such was ever particularly mentioned in the conversations with Hattie Barnes about which he testified but he said "she used the words 'all property' of she and her husband" (R. 22).

At her husband's death Hattie E. Barnes signed the affidavit which is Exceptor's Exhibit 18 (or 17) to show that by the terms of the joint and survivorship deed by which title was held, title vested in her at the death of her husband, George W. Barnes.

It is in order to examine the testimony of witnesses other than Mr. Prince regarding Mr. and Mrs. Barnes and their alleged agreement to divide their property and do what was necessary to see that at the death of the survivor the unconsumed estate would be divided equally between the Karns and the Barnes. The first of these witnesses is Alto Karns. Her testimony is at pages 45 to 56 of the Record.

Alta Karns was a sister-in-law of Hattie Barnes. She had two children who inherit their father's share under the will

of Hattie E. Barnes. If the exceptions are found to be well taken, these children will receive less under the will of Hattie E. Barnes than if the exceptions are found to be not well taken and are overruled.

Alta Karns lived with the Barnes for close to two years prior to Hattie E. Barnes' death and knew the family well for over fifty years. She was familiar in a general way with the wills which both Mr. and Mrs. Barnes left and testified that she had many conversations with Mr. and Mrs. Barnes relative to those wills. She said those took place a "good many years ago. It was not so long after George Smith and his wife was killed at Vandalia and then they said they was going to fix their estate so there wouldn't be any trouble like there was in that estate" (R.47). She estimated that this was in 1917. She testified (R. 48) that she talked to them often after that and testified that the substance of what the decedent, Hattie E. Barnes, would say in these conversations was " 'I have got everything fixed so there won't be no trouble when I am gone.' Everything was to be sold and everything to be divided equally. That is what she always said" (R.48). She said Mrs. Barnes told her that as late as "just before we took her to the hospital." She said that on that occasion Mrs. Barnes said "Well, if anything happens there won't be any trouble for everything is fixed" (R.48). She testified she had conversations with both Mr. and Mrs. Barnes about this subject many times (R. 48, 49) after they moved to Tipp in 1917. Mr. Barnes, according to the witness, was incompetent for many years before he died but from 1918 up until the time he became incompetent she had many conversations with him about this matter (R. 50, 51).

In response to Mr. Faust's question, "What did they tell you?" the witness answered: "They said they had fixed wills and it was to be divided fifty-fifty. Everything was to be sold and the property and everything was to be divided fifty-fifty." Question: "When they said fifty-fifty, did they tell you what they meant by fifty-fifty?" Answer: "They just meant, you know, that everything would go half to her people and half to his people." Court: "Is that what they said?" Answer: "Yes, everything was to go half to his people and half to her people." Question: "That is what they told you?" Answer: "That is what they told us." Question: "They told you everything was to be divided?" Answer: "They wasn't a bit backward about talking before me and my husband about their affairs. They never was" (R. 51, 52).

The testimony which follows this is important to consider in this connection also. Question: "After George W. Barnes' death, did you ever have any conversation with Hattie E.

Barnes relative to how she expected her property to go or how she wanted it to go?" Answer: "I just said, didn't I, when she went to the hospital she didn't think she would have any trouble because everything was fixed." Question: "Did she say how it was fixed?" Answer: "Lot of times—Maybe not just that day but lots of times she would say it was to be half for each side." Question: "That was after George's death?" Answer: "Yes." Question: "What was to be half for each side?" Answer: "She wanted everything sold, turned into money, and the money divided."

The testimony which follows shortly after the above testimony at R. 52, 53, is also relevant. Question: "State whether or not they ever said anything to you about having an agreement or understanding as to the way the property was to be divided." Answer: "Mr. and Mrs. Barnes, between them, you mean?" Question: "Yes." Answer: "Why sure they did."

The next witness to testify about the old folks and about the alleged agreement between them under which their property was to be divided and each would do what was necessary to see that the brothers and sisters of each would share equally in the unconsumed estate remaining at the death of the survivor, was Bertha Mae Heckman. She was a neighbor who had resided in Tipp City for 48 years and had known the decedent and her husband for 15 or 16 years (R. 56). She was well acquainted with them and often had occasion to visit in their home (R. 57). She said she had conversations with them many times and some related to their wills or an understanding or agreement among themselves relative to their property (R. 57). When asked what these conversations were the witness testified: "The time that stands out most in my mind was after my husband passed away, 11 years ago last February. It was between that time and spring that I was there. I always went to them with my joys and sorrows and talked it over with them. I went over to their home and was talking of my affairs and they began to tell me how they had their affairs fixed and Mr. Barnes spoke up and he said, 'Well,' he said, 'Hattie received some money from her parents' estate and I received a little from mine, and we have worked over these years and saved what we have, and we had this will made out that everything is to be left to the survivor and at our death if we have any debts we want them paid and then everything left equally divided for the Barnes family and the Karns family' " (R. 57). She testified (R. 58) that conversation took place 11 years ago. She testified that they had other conversations about this subject, one of which was after Mr. Barnes passed away and she was talking to Mrs. Barnes

and at which time Mrs. Barnes said that her attorney had told her that everything belonged to her now and if she desired to change the will, she could, but she said "George and I went together and had that will made and I want it to stay just like it is" (R. 58). She said this conversation took place something like six months after George Barnes' death. In answer to a question as to whether or not Mr. and Mrs. Barnes ever told her they had an agreement or understanding with each other to that effect, the witness answered that "they both talked about it at the same time and she made the remark they went together—'We went together, George and I went together.' I guess that is an agreement. That is the statement she made and when he was talking he made the same remark that they had gone together to have this will made" (R. 59).

The next witness was one Lily Lane, a neighbor who lived at 510 Horton Ave., Tipp City, near where Mr. and Mrs. Barnes lived. She lived right beside the Barnes for about 25 years and had occasion often to visit them. She testified during these visits she did not have conversations with them relative to their affairs, "only she (Mrs. Barnes) just told me after they were gone things must be sold and divided even to the Karnes and the Barnes the same" (R. 62). She said Mrs. Barnes told her this after Mr. Barnes died (R. 62), at least three or four times. In answer to a question as to whether Mrs. Barnes had told her what property was to be divided, the witness answered: "She said everything should be sold and divided and divide the money between the Karnes and the Barnes. It was to be divided equally" (R. 63).

No testimony was offered to contradict any of this testimony. In fact, the heirs of Hattie Barnes resisting the exceptions offered no testimony. They rested their case after the testimony of Lily Lane.

So much for the testimony of what the decedent and her spouse **said.** Let us turn and see what they **did** with reference to their property.

Some time prior to 1926 they divided their property equally between themselves insofar as that was possible. Property acquired after that was divided equally. They each had the same number of bonds. Their names were jointly on their checking account and building and loan account. Each executed identical wills. These are exhibits 16 and 2 and each provides that all personal property go to the surviving spouse for and during his or her natural life, as he (or she) may care so to do and use the proceeds in any way he (or she) may see fit. Each will gives the survivor the necessary and proper authority to sign any and all papers required for the sale,

transfer and delivery of any of said personal property he (or she) may dispose of.

The will of Hattie Barnes contained the following provision:

"After the death of my said husband, George W. Barnes, I give and bequeath whatever remains of my said personal property to my brothers and sisters * * * share and share alike."

The will of George W. Barnes had a similar provision in it.

Similar devises are made of real estate, namely: "to the spouse for life with full power to sell and convey and to use the proceeds derived from the sale as he may care to expend as he may see fit,—remainder to brothers and sisters."

When they acquired their real estate, Lot 1026, Tipp City, Oct. 19, 1925, they did so by a joint and survivorship deed (Exhibit 18), so this provision was a vain thing.

Now what findings are warranted from this set of facts? (The contention of the exceptors is that this record "shows that from prior to the time that these parties purchased the real estate that it was their desire, intent, purpose, contract and agreement by express declaration and written mutual wills that their property should be divided equally so that one-half would descend to the brothers and sisters of George W. Barnes and one-half to the brothers and sisters of Hattie E. Barnes. (Exceptor's brief, page 7).

A. The first is that the evidence is clear and convincing that Mr. and Mrs. Barnes, in consideration of mutual promises, made and had an oral agreement prior to 1925 to make mutual wills and to do whatever else was necessary to assure that the first decedent's property would pass to the survivor with full power to consume and at the survivor's death pass to the first decedent's brothers and sisters. It was the intent of this agreement that the unconsumed estate owned by the survivor at his death be divided equally between the Karnes and the Barnes.

B. The agreement was not clear as to whether or not the survivor, Hattie Barnes, relinquished her right to a year's allowance and statutory set-off. In fact, it is silent in this respect.

C. While this agreement was oral, it was partially performed.

D. The parties divided their property equally and evidenced their intention by executing mutual wills. Really to have carried out her part of the agreement, the survivor, Hattie E. Barnes, should have executed a new will after the death of George Barnes, but due to a misunderstanding on her part she did not do so. The contract embraced all property, including real estate.

E. George W. Barnes died first—July 27, 1944 and his will was duly admitted to probate, administered in the Probate Court of Miami County, Ohio, under No. 30807. As indicated above, his will is "Exhibit 15." The deed by which he and Hattie E. Barnes held title to the real estate mentioned herein is "Exhibit 18," and the affidavit by which transfer of the entire title to Hattie E. Barnes was effected is "Exhibit 18" also.

F. Hattie E. Barnes elected to take under said will (Exceptor's "Exhibit 19 and 20").

G. In Schedule C of the Inventory filed in George W. Barnes' estate (Exceptor's "Exhibit 16") there is listed an undivided one-half interest in checking account in Tipp Citizens National Bank in the name of G. W. Barnes or Hattie E. Barnes in the total amount of $868.46, one-half of which is $434.23. There is also listed an undivided half interest in Savings Share Account No. 2389 in Monroe Federal Savings & Loan Association in the name of G. W. Barnes and Hattie E. Barnes in the total sum of $833, one-half of which is $416.50. There is also listed the following U. S. Treasury Bonds, 2 7/8%, 1955-1960:

No. 4411-A issued March 1, 1935 in sum of $5.000

No. 54895-E issued March 1, 1935 in sum of $1,000

No. 54894-E issued March 1, 1935 in sum of $1,000.

The total appraisement in said estate is $7,850.73 and the amount set off to the widow, Hattie E. Barnes, $1,570.15. This is shown in the inventory and it is also shown that the widow was allowed $1,200 year's allowance. The account filed in the estate of George W. Barnes (Exceptor's "Exhibit 17") shows as distributed to Hattie E. Barnes "with full power of disposition under second item of will" two U. S. 2 7/8% Treasury Bonds 1955-1960, Nos. 110, 540-L and 110, 541-A in the denomination of $1,000 each, "issued in lieu of two U. S. 2 7/8% Treasury Bonds 1955-1960, Nos. 54694E and 54895E issued March, 1935 in the face amount of $1,000 each. The testimony of Mr. Prince (R. 6, 10 and 11) showed that the identical bonds would have been distributed to Hattie E. Barnes but for the fact that these bonds were registered in the name of George E. Barnes and interest checks were payable in that name. Unless the bonds were exchanged, Hattie E. Barnes could not have received the interest checks.

The account further shows distribution to Hattie E. Barnes, legatee, "with full power of disposition under second item of will of decedent," two $1,000 bonds, 2½% Treasury Bonds, 1966-71, Nos. 5470-L and 4571-A, each in the face amount of $1,000 which were purchased on November 27, 1944, out of

the balance of decedent's estate in partial payment of distributive share of Hattie E. Barnes.

The account also shows distribution to Hattie E. Barnes, legatee, "with full power of disposition," et cetera, $666.44. It shows payment of her year's allowance and statutory set-off also.

Under the will of Hattie E. Barnes her property is bequeathed and devised to her brothers and sisters. Her will was duly admitted to probate. Ira W. Barnes was appointed Administrator W. W. A. and an inventory filed December 3, 1947. This inventory is "Exhibit 8". The exceptions before the court concern the following property listed in that inventory:

1. $434.23 of the checking account.

2. $416.50 of the Monroe Federal Savings & Loan Association account No. 2389.

3. Three U. S. Bonds No. 110540-L in the amount of $1,000, and No. 110541-A in the amount of $1000, and 4571-A in the amount of $1,000.

4. One-half interest in Lot No. 1026, Village of Tippecanoe, Miami County, Ohio.

5. One-half interest in household goods.

6. $666.44—part of proceeds of sale of $5,000 bond in George W. Barnes' estate.

7. $1,000 bonds Nos. 4572-B and 4573-C—said to have been purchased with proceeds of bond listed in George W. Barnes' inventory as 4570-L and what Hattie E. Barnes received from the George W. Barnes' estate for her year's allowance and statutory exemption.

These will be taken up in the order listed and the court's findings of fact with reference to said property and bonds announced.

(1) and (2)—Both the checking account ($434.23) and the one-half interest in the Monroe Federal Savings & Loan Association, Share Account No. 2389 ($416.50), were transferred to Hattie E. Barnes in part payment of her year's allowance and statutory set-off. Hence, neither was "distributed" to her in the usual sense of the term. The checking account which was transferred to Hattie E. Barnes in part payment of her allowance continued in her name. There was deposited in the account the $1,200 received for her year's allowance and the $1,520.15 received by her as a statutory set-off (R. 28). The $666.44 which was distributed to her was deposited in said checking account February 8, 1945. In addition to these deposits of amounts received from her deceased husband's estate there were other deposits ranging from $100.62 to $28.75 over a period of a couple of years (R. 28, 29). The balance in the account at her death was $1,213.98.

There were many withdrawals from the account (R. 29, 30). In other words, there was a co-mingling of the funds received by Hattie E. Barnes in distribution of her deceased husband's estate and payment of her year's allowance and statutory set-off with her own funds and much of the combined amount was used by her. This money may have gone to pay the funeral bill and attorney fees also. They amounted to over $800. It's not too imporant because whatever was left was put into the two $1,000 bonds which were purchased from what was left from the proceeds of the $5,000 bond sold. One of these is the identical bond among the assets of the Hattie E. Barnes' estate and is part of the subject of the third branch of the exceptions.

(3)—These three bonds, 110540-L, 110541-A and 4571-A, are the identical bonds distributed to Hattie E. Barnes from the estate of George W. Barnes, deceased. Those numbered 110540-L and 110541-A were the bonds exchanged for the bonds described in the George Barnes inventory as 54895-E and 54894-E, $1,000 each. The testimony showed that the latter were registered bonds in the name of George Barnes and the Federal Government would not pay interest to Hattie Barnes unless they were exchanged for the new bonds (R. 6, 10, 11).

(4)—Hattie E. Barnes acquired legal title to the entire Lot 1026, Tippecanoe City by virtue of the contract contained in joint-and-survivorship deed (Exceptor's "Exhibit 18").

(5)—George W. Barnes owned certain household goods jointly with his wife but upon his death they were not deemed assets of the estate because the attorney for said estate advised appraisers that ordinarily the household goods are deemed assets of the wife, the husband presumably buying them for her, and not that of the husband, so that in each and every case where the husband passed away first, they are by custom omitted from the inventory of the husband's estate (R. 20). No exceptions were filed to said inventory.

(6)—$666.44, this amount is traceable into the checking account of Hattie E. Barnes. It was received by her in partial distribution from the estate of George Barnes and co-mingled with other funds which were received by her from said estate in payment of her year's allowance and statutory set-off, and subsequently, other funds received by her as income from her own property. Regarding this checking account, see (1) above. An accounting should be had to determine if, after the $666.44 was deposited, the balance in the account ever got below that amount, and if it did, whether or not the withdrawal which took it below $666.44 went to purchase anything

now reflected in the inventory to which exceptions have been filed.

(7)—Bonds Nos. 4572-B ($1,000); and 4573-C ($1,000), listed in the inventory as Hattie E. Barnes' were alleged by the exceptors to have been acquired with the proceeds of bond 4570-L which Hattie Barnes received from the estate of George Barnes and what she received for her year's allowance and statutory set-off. However, the evidence is not clear and convincing that the proceeds realized by Hattie Barnes from the sale of the bond numbered 4570-L is traceable into these two bonds.

Regarding bond No. 4570-L ($1,000) distributed to Hattie E. Barnes from George Barnes' estate, the record shows it is not among the assets of Hattie E. Barnes' estate. Presumably it has disappeared. There has been no testimony to show whether or not Hattie Barnes cashed the bond and "consumed" the proceeds; and, if she did, whether or not she used (a) her own income or (b) her own funds and property before doing so.

## Conclusions of Law.

Jurisdiction.

A. The first conclusion is one already stated at page 1 of this decision and which is repeated and amplified here for the sake of clarity. It relates to the power of a court to pass on the claims of the exceptors in a hearing on exceptions to an inventory where as in this case the exceptions are certified by the Probate Court to the Common Pleas Court under the provisions of §10501-9 GC and pursuant to §10501-10 GC, the case is submitted to the Common Pleas Court.

Sec. 10501-10 GC provides that when a matter is certified to the Common Pleas Court as this one has been, the court "shall hear and determine it **as though it had original jurisdiction of the subject matter.**" The court feels that a reasonable construction of this and the only one possible is that the Common Pleas Court shall have such power to hear and determine the exceptions to the inventory as the Probate Court would have if the matter had not been certified. To hold otherwise would give a Common Pleas Judge to whom the exceptions were certified more power than one who was designated to sit as Probate Judge in the event that the Probate Judge who was disqualified had requested the assignment of a non-resident judge to hear the case.

The power of the Court generally on hearing exceptions to an inventory is governed by §10509-59 GC. **18 O. Jur., Executors, p. 216, Sec. 169.** The code section provides that exceptions to inventory may be filed by any person interested in the estate or in any property included in the inventory. It provides

that when exceptions are filed, notice thereof and time of hearing thereon shall forthwith be given to executor or administrator and his attorney by registered mail or personal service unless such notice is waived. It continued "At the hearing the executor or administrator and any witness may be examined under oath. The court must enter its finding on the journal and tax the costs as may be equitable."

"The Probate Court has constitutional jurisdiction of probate and testamentary matters and the accounts of executors and administrators. Such constitutional jurisdiction necessarily comprehends jurisdiction of inventories of administrators and executors and exceptions thereto, as inventories are essential to the accounting of executors and administrators Incident to the constitutional jurisdiction in the premises, the Probate Court has plenary power to dispose of any matter properly before it, including the power to adopt and apply remedies which are legal or equitable in their nature. The exercise of such jurisdiction by the Probate Court is mandatory and not discretionary." **In re Estate of Thrush, 76 Oh Ap 411,** 64 N. E. 2d 839, 844.

"The purpose of exceptions to an inventory is to correct the same by causing it to reflect proper statutory allowances and the items of property which are subject to administration by an executor or administrator of a decedent, and to exclude therefrom the specific items of property owned by others which are not subject to administration." **In re Estate of Thrush, supra, 76 Oh Ap** at **page 422,** 64 N. E. 2d at page 844.

The Thrush case goes on to hold a hearing on exceptions is not to be used as a substitute remedy for the impression or enforcement of a trust in, or for an accounting of, the decedent's estate. But we feel the rule is that on a hearing of exceptions the Probate Court "is vested with full power to determine what property is lawfully included in an inventory as assets and as incidental thereto has jurisdiction to inquire whether inventoried personal property belongs to an exceptor as the beneficiary of a trust." **Bolles v. Toledo Trust Co., 1940, 136 Oh St. 517,** 27 N. E. 2d 145, 147; contra, **In re Estate of Thrush, 76 Oh Ap 411,** 64 N. E. 2d 839; **Brunskill v. Brunskill, 63 Oh Ap 529,** 27 N. E. 2d 492. Cf. Re Brady, 6 Ohio Supp. 284. I know of no reason why the rule should be different as to real estate.

The Brady case holds that the Probate Court can determine title on exceptions to an inventory, but it is a matter of discretion whether such a summary proceeding should be employed or the exceptors ordered to pursue other remedies. In the Brady case the Probate Court of Cuyahoga County refused

to exercise the jurisdiction which it concluded it had under the Bolles case. From what is stated in the opinion in that case it is easily inferred that the court would be reluctant to exercise the jurisdiction in any case. For instance, the court points out that exceptions on an inventory are summary proceedings and that the courts are not hospitable to such proceedings. They note that such proceedings are generally encouraged only where there is a possibility that harm will come to the litigants should a suit at law that involves a filing of pleadings, etc, be necessary. They note further that if there is an adequate remedy which would follow the ordinary proceedings required by law, with no great harm to the litigants, summary action should be discouraged.

However, I feel that any risk involved in employing a summary proceeding is more than offset by the gain which will result in avoiding a multiplicity of suits and unnecessary delay. The reluctance of higher courts to let the Probate Court assume jurisdiction to employ summary proceedings must be a hangover from the days when Probate Judges did not have to be lawyers.

I do feel that the discretion should be exercised with care, keeping in mind that the issues should be made up so that those resisting the exceptions will have ample notice of the nature of the exceptors' claim. In this connection it is to be noted that no objection was made by those resisting the exceptions to the form of the exceptions. Note also that there were two hearings in this matter, one on November 18, 1948 and an adjourned hearing on May 6, 1949. This is pointed out to show why the court feels that those resisting the exceptions, even if they were not completely apprised of the nature of the exceptors' claim at the first hearing, had ample opportunity to prepare between the first and the second hearing to find out what the nature of the exceptors' claim was and what to prepare for.

From this it is apparent that the court in this case has concluded that it has jurisdiction to employ the summary proceedings of impressing a trust and ordering an accounting and should and will exercise such jurisdiction, if the facts warrant.

The common intention of testators executing mutual wills sometimes amounts to a contract and sometimes does not. Page on Wills, Sec. 218. In the note at page 223 it is observed that in the case of **Walker v. Walker, 14 Oh St 157,** the case was decided upon the theory that the instrument in question, a joint will, was really a contract enforcible in equity and not a will to be probated. Technically, then, the wills in this case are probably neither "joint" nor "mutual" but

rather wills executed in accordance with common intention and in performance of a contract between the parties.

B. This conclusion relates to the right of exceptors (remaindermen) under the will of George Barnes in three bonds—110540-L, 110541-A and 4571-A which were distributed to Hattie E. Barnes and which are among the assets in her estate, and also to the property or funds ($666.44) distributed to her and co-mingled with her own so as not to be identifiable in the estate.

The power of a testator to give personal property to one for life, with full power to consume, with the unconsumed part going at the life tenant's death to third parties, is so well established as to make unnecessary the citation of any authorities. As to what property is embraced when a testator, as in this case, bequeaths "all my personal property, including money, stocks, bonds, chattel property and personal property of every description" in this manner, it is believed no problem is presented. The title of personal property of decedent passes to an executor or administrator and not to the legatees. Hence, it would be all the property left after the payment of debts, except real estate. If bonds of a large denomination had to be cashed in order to provide funds to pay debts and new bonds of a smaller denomination were purchased with the proceeds not required for that purpose—the life estate and remainder would be in the new bonds. If cash, bank accounts, building and loan accounts, etc. left after payment of debts the life estate and remainder are in such property.

Life tenants with a power to consume are implied or quasi-trustees of the remaindermen. **Johnson v. Johnson, 1894, 51 Oh St 446, 38 N. E. 61**; Perry on Trusts, Sec. 540. While they can use and enjoy the estate to its fullest extent for their support, and consume the whole of it, if necessary, they cannot go beyond what would be regarded as good faith toward the remaindermen. Ibid. It was aptly said in one case "The testator having so amply provided for the support of his wife, evidently contemplated good faith on her part towards his brothers and sisters. He therefore gave her the right to consume but not to recklessly squander or give away the estate." The Court held in that case that since there was a trust, such trust would be enforced against one coming into possession of the estate with knowledge of the trust. In that case the act of the widow in giving the property away was not "consuming it" within the meaning of the term as used in the testator's will, when a trust was applied.

Where a life tenant with power to consume has co-mingled the funds she received as donee with her own, the expendi-

tures for her purposes are presumed to be paid, "first, out of the income from the estate" then out of the donee's funds, and then "out of the corpus of the decedent's estate." Hutchinson's Estate v. Arnt, 210 Ind. 509, 1 N. E. 2d 585, 591, 4 N. E. 2d 202, 108 A. L. R. 530.

"Where testatrix disposed of her residuary estate to her husband for and during his natural life with full power to sell and convey during his lifetime any part or all of such property 'in such manner as he may desire and use such portion or portions of the proceeds of such sale or sales and in such manner as he may desire,' the estate created is that of a life estate with an unlimited power of sale together with the use of the proceeds thereof as the husband may desire.

"Under the terms of such residuary disposition, the husband becomes a trustee of that part of his wife's estate coming into his possession." **Rippel v. Rippel, 52 Abs 33, 78 N. E. 2d 902.**

C. This and the following conclusions relate to the real estate, title to which Hattie Barnes acquired solely by operation of the joint and survivorship clause in the deed by which she and George Barnes acquired it. They also relate to the money in the checking account and building-and-loan account which were not "distributed" to Hattie Barnes in the usual sense of the word but rather turned over to her in part payment of her year's allowance and widow's exemption. They relate also to the household goods jointly owned by the parties but which were left out of George Barnes' estate on advice of counsel and, pursuant to custom, "considered" as the property of the survivor.

Lastly, the following conclusions will relate to the two bonds described in No. 7 if they are found, to have been purchased with part of the proceeds received by Hattie Barnes ostensibly in payment of her year's allowance and widow's exemption. They will also deal with the exceptors' contention that even if these two bonds are not for any reason held to be their property, one of them should be declared to be to replace 4570-L ($1,000), which was distributed to Hattie Barnes but which is not among the assets of her estate.

"Where valid and subsisting agreement is entered into by two parties to leave property to each other, and mutual wills are executed in pursuance thereof, and thereafter contract is broken by one, of them after death of the other, action will lie for breach of contract, and in proper case there may be specific performance of contract **or declaration of trust as against those taking title to property in question.**

"Although provisions of mutual wills and subsequent cir-

cumstances may be such that contract to make mutual wills must be conclusively inferred, mere fact that wills are executed concurrently with full knowledge of their contents on part of testators will not be sufficient to imply such a contract." **Flower v. Flower, 32 Oh Ap 350, 166 N. E. 914.**

Statute of frauds cannot be interposed by wife's devisees, her husband leaving executed oral contract void under statute of frauds, so far as it related to lands, where there has been part performance, equity will enforce it. Doyle v. Fischer, 183 Wis. 599, 198 N. W. 763, 33 A. L. R. 733.

If the promisor has entered into a valid contract to devise or bequeath property and dies without leaving a valid will in accordance with the terms of the contract, equity will give relief, subject to the restrictions which equity imposes in cases of this sort in general, and subject to the facts of each specific case. This is often spoken of as specific performance. It is, of course, not technically specific performance * * * it is rather relief in the nature of specific performance. The real purpose of such a proceeding is to have the heirs, devisees or next of kin or personal representatives of the deceased promisor held as trustees of the property which the promisor had agreed to devise or bequeath, and to compel them to hold the legal title thereto for the benefit of the promisee. Page on Wills, Lifetime Ed. 1736. Among the many cases cited as authority for this last proposition is **Emery v. Darling, 50 Oh St 160, 33 N. E. 715.**

Trusts may be classified into two groups: express trusts and implied trusts. Implied trusts, in turn, are divided into two classes: resulting trusts and constructive trusts.

Express trusts arise from intention and either rest upon the declaration of the donor or creator of the trust, or upon the declaration of the trustee but they may also arise from an agreement of the parties. **40 O. Jur., Sec. 3, page 98.**

Pomeroy, Equity Jur. 4th Ed., Vol. 3, Sec. 1007, p. 2227.

"When the trust is not created in or by the instrument of conveyance, it may be sufficiently declared and evidenced by the trustee to whom the land is conveyed, or 'who becomes holder of the legal title; and this may be done by writing, executing simultaneously with or subsequent to the conveyance, and such writing may be of a most informal nature."

(The Ohio statute of frauds omits the section relating to trusts, and the declaration need not be in writing.)

Previous to the enactment of the statute of frauds in this state, trusts might be created in real estate by parol and established by parol evidence, and there is nothing in our statute that prevents the establishment of an express trust by evidence of the same kind * * * and express trusts are allowed to

be proved by parol evidence as well as resulting trusts which arise by operation of law, are affected by the statutes. **Harvey v. Gardner, 41 Oh St 642, 646.**

The creation of a trust in lands by parol is not to be considered as varying the terms of the deed absolute on its face, but only as setting up an independent contract consistent with it. **Fleming v. Donahoe, 5 Ohio 255.**

"Declarations by the grantor, however, prior, contemporaneous or subsequent to the transaction are admissible to show the one express trust." **40 O. Jur. Sec. 34, p. 168.**

"Owner of personal property may by oral or written declaration, without any consideration, declare himself trustee of the property for a beneficiary. Such a trust which is made to take effect after the death of declarant, being complete and thus creating a perfect trust, is not testamentary and is valid though the will's act is not complied with." **40 O. Jur. 154.**

"No particular formality of words is necessary to create a trust by will. The intention of the testator determines whether the trust has been created. It is competent to show by parol evidence the conversations had by the creator of a trust with his attorney at the time of the creation of the trust instrument." **40 O. Jur. 146-149.**

"Not necessary that an intention to create a trust relationship be expressed in terms; an acceptance by conduct by a person of the terms which in themselves propose that a trust relationship be set up, is all sufficient."

"An express trust may be created even though the parties do not understand what a trust is, and whether or not so created may be determined from all the circumstances surrounding the transaction between them." **Norris v. Norris, 40 Abs 293, 57 N. E. 2d 254.**

Hence, so far as the statute of frauds is concerned, trusts, even in land, may be created without a writing. **40 O. Jur. 165.**

"An express trust in lands may be created by a parol declaration of a grantee in those jurisdictions where a trust in lands is not required to be in writing.

"This is so notwithstanding the fact that the deed is absolute on its face, and in such cases, it is not necessary to allege fraud, accident, or mistake." **129 A. L. R. 689; Sparks v. Mince, Tex. Civ. App., 138 S. W. 2d 203.**

Where two persons agree to make mutual and reciprocal wills disposing of separate estates, and wills are made, and after death of one, other party takes under will and accepts benefits, equity will enforce specific performance of oral agreement.

Although oral agreement to make mutual wills was to devisees of wife, oral contract to execute mutual wills provable by parol. Crary v. McCrory—9 Ohio N. P., N. S., 1, 20 Ohio Dec. 110.

A resulting trust is one which the court of equity declares to exist where the legal estate in property is transferred or acquired by one under facts and circumstances which indicate that the beneficial interest is not intended to be enjoyed by the holder of the legal title. Citing 43 A. L. R. 1408; 26 R. C. L. 1214; Bogert, Trusts, p. 92. The object of the court in trusts of this class is the enforcement of the intention or the presumed intention of the parties. **Linney v. Cleveland Trust Co., 30 Oh Ap 345, 165 N. E. 101.**

"A constructive trust is one which courts of equity declare to exist as a **means of prevention** or 'correction of fraud or **prevention of unjust enrichment.** 26 R. C. L. 1232. Bogert, p. 92. A constructive trust should be considered as a remedial device and not a branch of substantive law. This concept seemed implicit in the expression of Marshall, C. J., that "in such a case equity becomes the artificial conscience of the malefactor." And in the remarks of Wright, J., who said: "Perhaps the matter in question is not, strictly speaking a trust at all, but a ground of relief based on fraud." A failure to adhere to this remedial characteristic of the constructive trust has seemingly resulted in the failure of justice and the failure of correction of fraud. Constructive trusts, thus considered as a device for prevention of fraud **and** unjust enrichment, are easily distinguished from resulting trusts, which are designed to further the intention of the parties. **Newton v. Taylor, 32 Oh St 399.**

"That a wife may relinquish her right to a widow's allowance or exemption by a postnuptial agreement based upon a valid consideration has been both asserted and denied. Even if the power exists an agreement will not be construed as a waiver of the widow's rights in this respect unless such an intention is entirely clear." 24 C. J. 252; see also 34 C. J. S., Executors and Administrators, § 341.